REVISED October 15, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 17, 2009

Charles R. Fulbruge III
Clerk

No. 08-70049

LINDA ANITA CARTY,

Petitioner - Appellant,

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent - Appellee.

Appeal from the United States District Court
for the Southern District of Texas, Houston Division

Before KING, DENNIS, and OWEN, Circuit Judges.

KING, Circuit Judge:

A Texas jury convicted and sentenced to death petitioner–appellant Linda Anita Carty for the intentional murder of Joana Rodriguez during the course of a kidnaping of Rodriguez and her newborn son. The Texas Court of Criminal Appeals affirmed the conviction and sentence and denied post-conviction relief. Carty then filed this federal habeas petition under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. The district court denied substantive relief, denied Carty's request for an evidentiary hearing, and dismissed her case. It then granted a certificate of appealability ("COA") for two substantive claims. The first is whether trial counsel rendered ineffective

assistance by failing to notify Carty's ostensible common-law husband of his marital privilege not to testify. The second is whether trial counsel rendered ineffective assistance by failing to present additional mitigation evidence in the punishment phase. The district court also granted a COA for the procedural issue that prevented adjudication of those substantive claims—whether Carty exhausted state court remedies.[1]  Carty's appeal is now before us.  We affirm the district court's judgment denying Carty relief.

## I.  FACTS AND PROCEDURE

The district court's exhaustive opinion more than adequately documents the factual background and procedural development of this case.  See Carty v. Quarterman (Carty Federal Habeas), No. 06-614, slip op. at 4–35 (S.D. Tex. Sept. 30, 2008).  Here, we revisit only those facts relevant to our disposition of the presently appealed issues and claims.

Carty, a foreign national citizen of St. Kitts and thus the United Kingdom, was indicted by a Texas grand jury for the kidnaping and intentional murder of Rodriguez.  Carty planned the kidnaping of Rodriguez and her baby, facilitated its execution, and murdered Rodriguez on May 16, 2001.  Although Carty originally hired her own attorney, when her family could not pay his fees, the Texas trial court appointed Jerry Guerinot and Windi Akins to represent her (collectively, "trial counsel").  Trial counsel met Carty for the first time approximately two weeks before jury voir dire.  They hired investigator John Castillo and psychologist Dr. Jerome Brown to aid Carty's defense.  Investigator Castillo began his work about two weeks before trial.

---

[1] The court denied a COA for the remainder of Carty's claims.  In a separate opinion, we denied Carty's request for an additional COA.  See Carty v. Quarterman, No. 08-70049, slip op. (5th Cir. Aug. 28, 2009).

The trial proceeded in two phases: guilt/innocence and punishment. The evidence presented in the guilt/innocence phase revealed the following events. Approximately three years before Rodriguez's murder, Carty started living with Jose Corona, and the parties now dispute whether they entered into a common-law marriage. Corona testified that they lived together up until two weeks before the murder, and, during that period, they represented to others that they were husband and wife, as discussed in greater detail below. While they lived together, Carty, who had a grown daughter, Jovelle Carty, told Corona three times that she was expecting another child, but she did not allow him to attend her prenatal doctor's visits. In the first two instances, Carty eventually told him that she had miscarried. Corona believed that Carty lied about the pregnancies. At the beginning of May 2001, the month during which Rodriguez was murdered, Corona decided to leave Carty, in part because of her lies about being pregnant. When he told her that he was leaving, Carty again claimed that she was pregnant. Corona, however, did not believe her and moved out. Throughout May, Carty repeatedly called Corona to reconcile their relationship, claiming that she was pregnant and that her due date was in the middle of May. On May 15, she called multiple times and told him she was going to have a baby boy the next day, May 16. She called again on May 16—after she had murdered Rodriguez—and confirmed that she was going to have the baby. When Corona saw Carty later that day at the police station, after she had been arrested for Rodriguez's kidnaping and murder, he asked her if the baby had been born already, and she told him "not yet." Corona eventually found out that Carty had never been pregnant.

Other witnesses' testimonies revealed Carty's activities between Corona's departure and Rodriguez's murder. In early May, Carty began moving her

3

things to a storage unit because the apartment lease was due to terminate at the end of the month. Sherry Bancroft, an employee at Public Storage, testified that Carty had an existing storage unit in their facility and rented a second one on May 10. Two days later, she rented a third unit. That day, she told Bancroft that she was already in labor and was expecting to give birth to a baby boy that day. To Bancroft, however, Carty did not look like she was in labor. Carty returned to the storage facility on May 15 in a Pontiac Sunfire. At that point, she told Bancroft that she had birthed a son and that he was at home with his father. She retrieved a baby blanket and two baby outfits from one of her storage units.[2]

Numerous witnesses testified about the kidnaping and murder that occurred the next day, May 16. Early in the morning on May 16, four men—three of whom were later identified as Christopher Robinson, Carliss "Twin" Williams, and Gerald "Baby G" Anderson—broke into the apartment where Rodriguez lived with her husband (Raymond Cabrera), her infant son, and her husband's cousin (Rigoberto Cardenas). Cardenas testified that the men demanded drugs and money. While the men were in the house, Cardenas heard a cell phone ring. One of the men answered it and said: "We are here inside," and "Do you want it?" The man on the phone then yelled: "She's outside, we got to go." The intruders tied up Cabrera and Cardenas and, now joined by Carty, kidnaped Rodriquez and her baby.

The testimony of Robinson and other individuals with first-hand knowledge of the kidnaping and murder evidenced that Carty planned and

---

[2] At least two additional witnesses testified that they knew Carty and that she had told them in the days immediately before Rodriguez's murder that she was expecting a baby.

4

orchestrated the crimes because she wanted Rodriguez's baby. On Sunday, May 13, Carty began recruiting a group of people to help her abduct the baby. She asked Robinson, Josie Anderson, and Marvin "Junebug" Caston to assist in a "lick"—a burglary wherein they would break into an apartment and steal what she claimed was approximately 200 pounds of marijuana. Carty brought them to her apartment, which was in the same complex as and in close proximity to Rodriguez's apartment. From Carty's apartment, they scoped out Rodriguez's apartment and familiarized themselves with the standard layout of apartments in the complex. Carty told them that Rodriguez was pregnant with Corona's child; that "I'm going to get the baby. I'm going to . . . take the baby from them. . . . I'm going to cut the baby out of the lady and take the baby"; and that "she needed the baby, needed a baby, needed a baby, needed their baby, that she needed the lady's baby." She repeated similar statements throughout the planning of the crime. Because Josie Anderson, Robinson, and Caston were only interested in stealing drugs and not in kidnaping Rodriguez's baby, the plan was for them to secure the drugs while Carty dealt with Rodriguez.

On the night of Sunday, May 13, the group went to the apartment complex to conduct the lick but soon aborted their attempt. Afterwards, Josie Anderson and Caston decided that they would no longer participate. Carty nonetheless persisted in her plan, and on Tuesday, May 15, she convinced Robinson, his friend Williams, and Josie's cousin Gerald Anderson to participate in the lick. The new plan was for Carty to wait outside the apartment, and the men would bring Rodriguez to her after they secured the drugs for themselves. After midnight on May 16, 2001, Carty, Robinson, Williams, and Gerald Anderson left 6402 Van Zandt Street, a house that served as the group's staging area. Carty drove her car and served as a lookout. After parking in a lot near the

apartments, she called Gerald Anderson and told him to start the lick. The men kicked in the door of the apartment and tied up and beat Cabrera and Cardenas. Carty called Anderson again and told him that she was coming inside. When she entered the apartment, Robinson lied and told her that they had killed the men (to prevent her from doing it). Robinson then left the apartment. A few minutes later, Robinson saw Carty leave the apartment with the baby. Williams and Gerald Anderson followed with Rodriguez and put her in the trunk of Robinson's car. They left the apartment complex, met at a storage unit, and transferred Rodriguez to the trunk of Carty's car. Both cars then returned to Van Zandt Street.

At Van Zandt Street, Carty demanded that the men tape up Rodriguez. Robinson and Gerald Anderson refused, but Williams complied. He then closed Rodriguez in the trunk of Carty's car. At this point, the men were angry because they had obtained little drugs or money in the lick; they believed that Carty had set them up for a kidnaping that they did not want to commit. Hearing the argument, Zebediah Combs, who lived at 6402 Van Zandt Street and did not participate in the lick, came outside and demanded that everybody be quiet. Carty said to him, "I got my baby. I got my baby." After seeing Rodriguez in the trunk of her car, Combs told Carty to move the car away from the house. Carty refused, and Combs went back inside. Meanwhile, Robinson, Williams, and Gerald Anderson went to make change for the money they had stolen.

When they returned around 3:30 a.m. to 4:00 a.m., Carty was standing partially in the trunk of her car and partially on the ground. Rodriguez was face down in the trunk, and Carty had placed a plastic bag over her head. Robinson ran up and pushed Carty away, but he could see that Rodriguez had stopped breathing. Robinson ripped the bag while attempting to remove it from

6

Rodriguez's head. When Robinson confronted Carty about why she had killed Rodriguez, Carty replied that it was her baby, her husband's baby.

During the police investigation of the burglary and kidnaping, a tenant in Carty's apartment complex, Florence Meyers, told police about an encounter with Carty the day before that was suspicious. On the evening of May 15, Meyers saw Carty sitting in the Pontiac Sunfire in the parking lot of the apartment complex. Carty told Meyers that she was pregnant and that the baby was going to be born the next day. There was an infant's car seat in the back seat of Carty's car. To Meyers, Carty did not appear to be pregnant. Meyers's statement caused the police to suspect Carty had committed the kidnaping.

After taking Meyers's statement, the police called Carty at around 9 a.m. on May 16 and pretended to respond to a complaint she had filed a few days earlier. She agreed to meet them. At the time of the call, Carty was in a car with Robinson and the baby. Robinson drove Carty to meet the police, and she agreed to go with them to a police station. When Carty did not return from the meeting, Robinson went back to Van Zandt Street with the baby.

Upon arriving at the police station, Carty told the police that she was a confidential Drug Enforcement Agency ("DEA") informant, and asked to speak with her DEA agent, Charlie Mathis. A few days before the kidnaping and murder, Carty had called Mathis and told him about being pregnant. The police then asked Mathis to help them find out what Carty knew about Rodriguez and the missing baby. Mathis told Carty she was in a lot of trouble and advised her to help the police.

After speaking with Mathis, Carty gave a statement to the police, telling them that she had loaned her daughter's car and rental car to some people she believed might be involved in the kidnaping. She directed officers to the house

7

at 6402 Van Zandt Street. When the police arrived, a black Chevrolet Cavalier belonging to Carty's daughter Jovelle, and the Pontiac Sunfire, which was rented in Jovelle's name, were both parked at the house. Police found the kidnaped baby boy alive in the Cavalier. They found Rodriguez's body in the trunk of the Sunfire. Her arms and legs were bound with duct tape, her mouth and nose were also taped, and she had a ripped plastic bag over her head which appeared to be taped around the bottom. A forensic expert later determined the cause of death to be homicidal suffocation. Carty's fingerprints were in both cars. Inside the cars, the officers found, inter alia, baby clothes, baby blankets, a diaper bag containing infant formula, and other baby paraphernalia. The diaper bag also contained a live round of .38 caliber ammunition. A .38 caliber gun was found by police in a drawer inside the house at 6402 Van Zandt Street; it was similar in appearance to a .38 caliber gun that Corona saw Carty possess before he left in early May.

The police traced Carty's cell phone records, which led them to Gerald Anderson. He eventually gave a statement and was charged with capital murder. Carty's cell phone records showed eleven calls logged between Carty's phone and the cell phone number that led police to Gerald Anderson from 12:50 a.m. and 2:50 a.m. on May 16. Seven of those calls were placed between 1:09 a.m. and 1:14 a.m., the time of the kidnaping.

Based on this and other evidence, the jury returned a verdict of guilty against Carty on the charge of capital murder.

During the subsequent punishment phase, both the state and Carty presented evidence relevant to Texas's "special issues."[3] The state primarily presented evidence about Carty's criminal history to show her ongoing dangerousness. For example, in 1992, Carty was arrested for auto theft when she rented a car that she never paid for or returned. To rent the car, Carty identified herself as an FBI agent, so the FBI also investigated her for impersonating an officer. Carty pleaded guilty and was placed on a ten-year term of probation (she was still on probation when arrested for murdering Rodriguez). The state agreed to dismiss the auto theft charge if Carty would act as an informant. Although she provided information leading to two arrests, her supervising officer concluded that she was an uncontrollable informant. Her service came to an end when she was arrested on drug charges. Police officers had been observing a large drug transaction when Carty entered the house under observation with a package. When she left, the police followed her. She led them on a high-speed chase. During the chase, Carty attempted to run over an officer. The police eventually recovered two pistols, $3,900 in cash, and fifty pounds of marijuana from her car.[4]

Trial counsel countered with testimony showing that Carty would not be a future danger and that mitigating circumstances existed. To dampen the impact of the prosecutor's evidence of Carty's future dangerousness, trial counsel

---

[3] In Texas, jurors must answer three "special issues" in favor of the death penalty for the court to impose capital punishment: (1) whether the defendant would "commit criminal acts of violence that would constitute a continuing threat to society"; (2) whether the defendant actually caused or intended to cause the death of the victim; and (3) whether mitigating evidence warranted "the imposition of life imprisonment rather than a death sentence."

[4] The prosecution also presented victim impact testimony from Rodriguez's family (her husband Cabrera, her sister, and her father).

enlisted the services of Dr. Jerome Brown, a clinical psychologist who evaluated Carty, interviewed her mother and daughter, and reviewed police interrogation tapes. He testified, inter alia, that Carty did not have problems with anger or aggression, was not prone to violence, and was not predatory towards other people. She had a stable family life and employment history. She did not have disciplinary problems as a child and described her upbringing as spoiled. Dr. Brown noted that Carty had a grown daughter and had given another child up for adoption when she became pregnant after a sexual assault. Dr. Brown opined that she would not be capable of committing the crime of which she was convicted, that her clinical profile indicated that she was not antisocial, and that she lacked characteristics normally associated with criminals. The prosecution, however, cross-examined Dr. Brown extensively to show that Carty was a liar. Dr. Brown also admitted that Carty met some characteristics of a child abductor, although on redirect he reaffirmed that she did not have traits commonly associated with violent people.

Trial counsel also presented testimony from Carty's family to support the mitigation special issue. Carty's mother testified that Carty was a beloved teacher in St. Kitts and that her former students still asked about her. Carty did not have a history of criminality while on St. Kitts, was kind and generous to others, and was never cruel to people or animals. Jovelle, Carty's daughter, testified that her mother was sweet and kind, was not mean, and had not harmed anyone. She had worked hard her whole life to put Jovelle through school. Isalyn DeSouza, Carty's closest sister, testified that she had never known her sister to be violent, destructive, or cruel.

Based on this evidence, the jury answered all three of Texas's special issues in favor of sentencing Carty to death. The trial court entered her

conviction and death sentence on February 21, 2002. The Texas Court of Criminal Appeals ("CCA") affirmed Carty's conviction and sentence. See Carty v. State, No. 74295, 2004 WL 3093229, at *1 (Tex. Crim. App. Apr. 07, 2004).

The trial court appointed counsel to represent Carty during the state habeas process. Carty timely applied for state habeas relief on August 6, 2003. One of Carty's claims was that trial counsel rendered ineffective assistance by failing to advise her of her right, as a citizen of St. Kitts and the United Kingdom, to consular notification and assistance. See Vienna Convention on Consular Relations ("VCCR"), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261. The British Government became aware of Carty's citizenship and filed a motion on February 2, 2004, seeking time to retain counsel who could amend Carty's application. Although recognizing that Carty was not authorized to raise new issues at that late date, it nonetheless asked the state habeas court to grant a period of 180 days in which "any amendment or supplement filed in that time should be accepted without the application of [TEX. CODE CRIM. PROC. ANN. art.] 11.071 [§] 5(f)." The state habeas court denied this application for want of jurisdiction.

Carty's habeas counsel filed a reply to the state's answer and later filed a further response, again asking the court to allow the British Government to intervene. The state habeas court did not issue an order on her request. The British Government, however, hired attorneys from Baker Botts, L.L.P., who entered an appearance unopposed on May 28 to serve as Carty's co-counsel. Carty's new co-counsel met with the state habeas judge and the prosecutors to discuss their role. They agreed to submit any additional pleadings to the court by November 1, 2004, the same day that both sides were due to submit their

11

proposed findings of fact and conclusions of law. The parties dispute, however, whether they agreed to permit Carty to raise entirely new claims at that time. Carty asserts that Jane Scott, a Harris County assistant district attorney, and Roe Wilson, Harris County's chief of the postconviction writs division, agreed that co-counsel would have approximately six months to familiarize themselves with Carty's case and make any additional filings, including proposed findings of fact and conclusions of law, by November 1, 2004. The state denies that any such agreement included permission to raise new claims. Absent a proper extension, November 1, 2004 was well after the deadline for Carty to file new claims. See TEX. CODE CRIM. PROC. ANN. art. 11.071 § 4(a) (Vernon 2007).

On November 1, Carty's co-counsel filed an Additional Further Response to the state's answer. On the same day, both parties filed their proposed findings of fact and conclusions of law. The Additional Further Response stated, "[C]ounsel for Carty and the State agreed to additional time for Carty's counsel to examine Carty's claims further. The Court approved this agreement." In the Additional Further Response, Carty raised entirely new claims, supported by exhibits and appendices. The new claims included the two substantive claims that Carty maintains in this appeal—whether trial counsel rendered ineffective assistance (1) by failing to notify Corona of his marital privilege not to testify and (2) by failing to present additional mitigation evidence in the punishment phase.

On November 30, 2004, the state trial court heard argument regarding Carty's habeas application. During that hearing, co-counsel addressed the Additional Further Response on behalf of Carty and argued about claims contained only therein. In particular, co-counsel raised the claims now on appeal. The state did not object and the state habeas court did not mention any

12

delinquency in the filings of those claims. Nonetheless, the court only reviewed the claims Carty raised in her initial application and recommended that the CCA adopt the state's findings of fact and deny those claims, see Ex Parte Carty, No. 877592-A, order (Tex. Dist. Ct. Dec. 2, 2004), a recommendation that the CCA adopted, see Ex Parte Carty, No. WR-61,055-01, slip op. at 2 (Tex. Crim. App. Mar. 2, 2005). Neither state court addressed the claims she raised for the first time in her Additional Further Response. Carty did not bring this omission to the attention of either court.

Having found no success in the Texas courts, on February 24, 2006, Carty filed an application in federal district court for a writ of habeas corpus under § 2254. She presented approximately twenty issues to the district court. The district court initially denied the state's motion for summary judgment and ordered briefing on certain issues, including whether Carty exhausted state court remedies for the claims she raised for the first time in her Additional Further Response. After briefing, the state renewed its motion. Carty responded and requested an evidentiary hearing. Without a hearing, the district court concluded that Carty failed to raise a triable issue of fact, granted the state's motion for summary judgment, and dismissed the case. See Carty Federal Habeas, No. 06-614, slip op. at 142. The district court held that Carty failed to exhaust the claims raised for the first time in her Additional Further Response and that, in any case, her substantive claims were not meritorious.

Carty then moved for a COA. The district court granted Carty a COA on whether she failed to exhaust the claims that she raised for the first time in her

Additional Further Response[5] and on whether trial counsel rendered ineffective assistance by failing to notify Corona of his spousal privilege and by failing to produce more mitigation evidence during the punishment phase of trial. It denied a COA for all other claims. See Carty v. Quarterman (Carty COA), No. 06-614, slip op. at 2–3 (S.D. Tex. Dec. 16, 2008). Carty now appeals the claims for which the district court granted her a COA.

## II. STANDARDS OF REVIEW

We review de novo whether Carty exhausted available state court remedies and whether the state waived exhaustion. See Taylor v. Cain, 545 F.3d 327, 332–33 (5th Cir. 2008); Wilder v. Cockrell, 274 F.3d 255, 259 (5th Cir. 2001). We apply the same de novo review to Carty's claims of ineffective assistance of counsel. See Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009); Smith v. Quarterman, 515 F.3d 392, 403 (5th Cir. 2008). Both types of claims present mixed questions of law and fact. See Ward v. Dretke, 420 F.3d 479, 486 (5th Cir. 2005) (ineffective assistance of counsel); Wilder, 274 F.3d at 259 (exhaustion). When examining mixed questions of law and fact, our de novo standard requires that we "independently apply[] the law to the facts found by the district court, as long as the district court's factual determinations are not clearly erroneous." Ramirez v. Dretke, 396 F.3d 646, 649 (5th Cir. 2005); see also Wilder, 274 F.3d at 259.

Our de novo review is governed by AEDPA. Under AEDPA, a federal court may not grant habeas relief after a state court adjudicates the merits of a claim unless that adjudication (1) "resulted in a decision that was contrary to, or

---

[5] As part of their briefing on the issue of exhaustion, both parties have addressed whether the state waived the defense.

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Therefore, neither the district court nor this Court may grant a writ of habeas corpus based solely on a finding of error by a state court." Evans v. Cockrell, 285 F.3d 370, 374 (5th Cir. 2002). Yet, the AEDPA-mandated deference to state court decisions does not apply if the petitioner properly exhausted his claim by raising it in the state court, but the state court did not adjudicate that particular claim on the merits. See Henderson v. Cockrell, 333 F.3d 592, 598 (5th Cir. 2003). We instead review such claims de novo without applying AEDPA-mandated deference. Riley v. Cockrell, 339 F.3d 308, 318 (5th Cir. 2003); see also Jones v. Jones, 163 F.3d 285, 299–300 (5th Cir. 1998) (applying de novo review to an ineffective assistance of counsel claim that the petitioner raised in state court, but the state court did not adjudicate on the merits). In this case, the CCA did not address Carty's claim of trial counsel's ineffective assistance in failing to inform Corona of his marital privilege. It adjudicated part, but not all, of her claim of ineffective assistance in failing to investigate and present additional mitigation evidence. We review under AEDPA's heightened standard the portion of Carty's claim of trial counsel's ineffective assistance in presenting mitigation evidence that the CCA adjudicated on the merits; the rest of her claims, including whether she exhausted them in state court, we review de novo.

## III. DISCUSSION

### A. Exhaustion

Carty raised most of her present claims for the first time in her Additional Further Response.[6] The state habeas court did not address these claims, which raises the issue of whether Carty exhausted them in state court. Under AEDPA, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "This longstanding exhaustion requirement is not jurisdictional, but 'reflects a policy of federal-state comity . . . designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Anderson v. Johnson, 338 F.3d 382, 386 (5th Cir. 2003) (quoting Wilder, 274 F.3d at 260). When undertaking review, "we ask not only whether a prisoner has exhausted his state remedies, but also whether he has properly exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts." O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); see also Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary opportunity, the prisoner must fairly present his claim in each appropriate state court . . . ." (quotation marks and citations omitted)); Mercadel v. Cain, 179 F.3d 271, 275 (5th Cir. 1999) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court."). To fairly present the claims, "'the applicant must present his claims in a procedurally correct manner.'" Beazley v. Johnson, 242 F.3d 248, 263 (5th Cir. 2001) (quoting Deters v. Collins, 985 F.2d 789, 795 (5th Cir. 1993)); see also Mercadel, 179 F.3d at 275 ("[A] claim is not

---

[6] For the portion of Carty's claim related to trial counsel's deficient presentation of mitigating evidence that she raised in her initial application for habeas relief in state court, this discussion does not apply. We review that portion on the merits below.

exhausted unless . . . the applicant present[s] his claims before the state courts in a procedurally proper manner according to the rules of the state courts." (quotation marks and citations omitted)). Fair presentation does not entertain presenting claims "for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor." Castille v. Peoples, 489 U.S. 346, 351 (1989) (quotation marks omitted). The purposes of the exhaustion requirement "would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it." Edwards v. Carpenter, 529 U.S. 446, 453 (2000).

Texas's habeas statute requires an inmate seeking relief from a judgment imposing a penalty of death to file an application for a writ of habeas corpus in the trial court, "returnable to the [CCA]," by the later of two dates: "the 180th day after [the appointment of counsel]" or "the 45th day after the date the state's original brief is filed on direct appeal." TEX. CODE CRIM. PROC. ANN. art. 11.071 § 4(a). This deadline is subject to a single, discretionary 90-day extension. Id. § 4(b). The state trial court is not authorized to consider any subsequent habeas application unless the applicant shows the statutory equivalent of cause and prejudice or actual innocence. Id. § 5(a). Texas courts usually treat an amended pleading filed after the deadline as a new habeas action: "If an amended or supplemental application is not filed within the time specified under Section 4(a) or (b), the court shall treat the application as a subsequent application under this section." Id. § 5(f). The state statute establishes detailed procedures for processing such subsequent applications. See id. § 5(b), (c).

17

Limiting habeas claims to those timely filed in the initial application encourages efficient, all-inclusive applications.  Ex parte Kerr, 64 S.W.3d 414, 418 (Tex. Crim. App. 2002).  As such, a dismissal for an abuse of the writ in the form of a tardy application is an adequate and independent state-law bar to federal review.  Whitaker v. Quarterman, 200 F. App'x 351, 356–57 (5th Cir. 2006).

In this case, Carty timely filed her initial habeas application on August 6, 2003. After the filing period expired, the state trial court denied the British Government the opportunity to amend Carty's application without treating the amended application as a subsequent application pursuant to article 11.071 § 5(f).  With the assistance of co-counsel, Carty nonetheless filed her Additional Further Response on November 1, 2004, raising new claims for the first time. The trial court and CCA did not address those claims; however, they also did not follow the procedures for handling subsequent applications as established in article 11.071 §§ 5(b), (c), and (f), and did not dismiss the Additional Further Response for abuse of the writ.  Furthermore, although the state did not move to treat the Additional Further Response as a subsequent application, Carty did not raise with the state courts their failure to consider the claims contained in her Additional Further Response.

Carty does not and cannot argue that her Additional Further Response was timely; instead, she urges that the parties entered into an agreement (sanctioned by the state habeas court) to permit her to add new claims in that filing that article 11.071 § 4(a) would otherwise bar.  As the parties have framed it, the exhaustion question has three components:  (1) did the parties and state habeas court agree to permit late-filed claims; (2) under Texas law, can the

parties extend the filing deadline by agreement; and (3) did the state waive its exhaustion defense.

For the first issue, the district court found that Carty did not show an agreement in fact to permit late-filed claims in the Additional Further Response. Carty Federal Habeas, No. 06-614, slip op. at 48 ("Nothing in the record . . . suggests that the parties and state habeas court agreed to suspend TEX. CODE CRIM. PROC. [ANN.] art. 11.071 § 5's limitation on tardy amendments."); id. at 53 ("Even if an agreement allowed her to file something, [Carty] has not shown that the parties agreed to suspend the application of TEX. CODE CRIM. PROC. [ANN. art.] 11.071 § 5(f), as was previously requested."). We hold that the district court's factual conclusion was not clearly erroneous.[7] Although Carty has pointed to some record evidence showing some agreement regarding co-counsel's submission of the Additional Further Response, she has not pointed to sufficient evidence to call into question the district court's conclusion that there was no agreement to permit tardy claims in that document. While statements in Carty's Additional Further Response and by co-counsel during oral argument before the state habeas court show that her habeas counsel proceeded as if the claims would be permitted, those statements permit only the weakest of inferences of any agreement. Co-counsel's generic statements of timeliness are hardly exceptional and are no basis on which to conclude an agreement existed. On the other hand, the state's failure to object to those statements or to the new claims

_____

[7] The district court based its decision in part on an affidavit presented by the state's federal habeas counsel, Neelu Sachdeva, who attested that "[t]here was no agreement between the State and habeas counsel concerning habeas counsel filing 'Additional Further Response to Respondent's Original Answer' and no agreement between the State and habeas counsel as to the substance of such document." Sachdeva, however, has not shown that she had firsthand knowledge of the meeting between Carty's habeas counsel and the state's counsel.

in general raises a stronger inference of an agreement, but that inference is counterbalanced by Carty's failure to follow-up with either state habeas court when both the trial court and the CCA did not rule on her new claims. Similarly, the state trial court's failure to submit the Additional Further Response to the CCA for review pursuant to article 11.071 § 5 also permits an inference that the new claims therein were not considered tardy by the trial court, but that inference is again counterbalanced by that court's and the CCA's decision not to rule on those new claims. Carty presents no other record evidence supporting her assertion that an agreement permitted her to file new claims in the Additional Further Response. Thus, Carty has failed to dislodge the district court's findings of fact. Having affirmed the district court's finding, we need not weigh the more difficult second issue—whether Texas statutory law permits the parties, with the tacit approval of the court, to agree to set aside the statutory deadline contained in article 11.071 § 4(a).[8]

---

[8] For this issue, Carty argues that state habeas courts may set aside the time line in certain circumstances, especially where the parties rely on the court. She cites cases in which courts have permitted or considered claims filed outside of the initial application. See, e.g., Coleman v. Dretke, 395 F.3d 216, 220 (5th Cir. 2004); Ex parte Ramos, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998); Ex parte Jennings, Nos. AP-75,806, 75,807, 2007 WL 4377072, at *1 (Tex. Crim. App. Dec. 12, 2007); see also Bagwell v. Dretke, 372 F.3d 748, 755–56 (5th Cir. 2004); Riley, 339 F.3d at 318. These case are distinguishable. In Jennings, 2007 WL 4377072, at *1, the CCA treated the supplement to the application as a successive petition and concluded that it met an exception to the successive writ bar. Here, the CCA did not rule that Carty's Additional Further Response qualified under an exception. In Ramos, 977 S.W.2d at 617, the state habeas court miscalculated the deadline for filing an initial application, so the prisoner's initial application was timely according to the court order but not under § 4(a). Here, no such mistake occurred, and Carty timely filed her initial application. Finally, Coleman, 395 F.3d at 220, was not a death penalty case; thus, Texas Code of Criminal Procedure art. 11.07 (which does not contain deadlines), not article 11.071 (which contains deadlines), applied. Furthermore, in Riley and Bagwell, we defined some of the ways in which a petitioner may exhaust a claim, but did not consider whether the claims were properly before the state habeas court. At best, the cases cited by Carty stand for the unremarkable proposition that in certain circumstances that do not exist in fact in this case, state courts have carved exceptions to the

20

Carty also argues that the state waived its exhaustion defense. Under AEDPA, the state may waive the exhaustion requirement through an express statement by counsel: "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). Although AEDPA requires an express waiver, it "does not require 'magic words' in order for a state to expressly waive exhaustion." D'Ambrosio v. Bagley, 527 F.3d 489, 497 (6th Cir. 2008).[9] "The touchstone for determining whether a waiver is express is the clarity of the intent to waive." Id. In Bledsue v. Johnson, 188 F.3d 250, 254 (5th Cir. 1999), we considered whether such a waiver had occurred. There, the state admitted, in its original answer to the federal habeas petition, that "'Bledsue has sufficiently exhausted his state remedies.'" Id. We held that "the state has waived any independent exhaustion argument, as well as the exhaustion argument included within the doctrine of procedural default." Id. In McGee v. Estelle, 722 F.2d 1206, 1213 (5th Cir. 1984) (en banc), we reached the opposite conclusion. In that case, we held that the state did not make an express waiver because "its pleading asserted only that it 'believed' that [the applicant] had exhausted state remedies." Id. Although we held that this was not an express waiver, we concluded that it was "at least

time lines of article 11.071 § 4(a).

[9] In D'Ambrosio, the Sixth Circuit looked in depth at the concept of express waiver, and held that "[t]he warden expressly waived the exhaustion requirement because her counsel's conduct during the district court proceedings manifested a clear and unambiguous intent to waive the requirement." 527 F.3d at 495–96. It clarified that "this is not a case in which the State simply failed to raise the exhaustion requirement in the district court" and that the fact that "the warden participated in discovery and moved to expand the record" did not "indicate, by itself, that the warden expressly waived the exhaustion requirement, as [the applicant] argues." Id. at 497.

the equivalent of failure to assert the defense of non-exhaustion." Id. We also approved of the Eleventh Circuit's treatment of a similar statement, which that court determined to be "closely related to an express waiver." Id. at n.22 (citing Thompson v. Wainwright, 714 F.2d 1495, 1502 (11th Cir. 1983)).

In this case, the parties dispute whether the state's statements and actions before the district court expressly waive exhaustion. The state argued to the district court in its motion for summary judgment that

> All but one of Carty's claims appear to be exhausted. Nevertheless, Carty fails to establish that she is entitled to habeas relief. Carty's claim of trial court error based on Crawford v. Washington, 541 U.S. 36 (2004), was never raised in state court. As a result, the claim is unexhausted and procedurally defaulted. Carty cannot overcome this procedural hurdle where, as here, she does not acknowledge exhaustion deficiencies or attempt to establish cause and prejudice as might serve to excuse her default. For those remaining claims which appear exhausted, Carty fails to demonstrate that the state court's adjudication was both incorrect and objectively unreasonable, that her claims merit relief, or that relief is not precluded under Teague v. Lane, 489 U.S. 288 (1989).

In the section entitled "Statement Regarding Exhaustion," the state also announced that "[t]he Director believes that Carty's claim of trial court error under Crawford v. Washington is unexhausted." These express statements show that the state treated only one claim, not presently at issue on appeal, as unexhausted. The rest, including the claims on appeal, it expressly treated as exhausted.[10] Thus, the district court's cursory conclusion that the state has not

---

[10] The state does not argue that its assertion of the defense of failure to exhaust after prompting by the district court preserved that defense if it had already expressly waived it. The district court has the ability to sua sponte raise procedural defenses like failure to exhaust; however, in the face of an express—as opposed to inadvertent—waiver, the district court typically abuses its discretion by raising a waived defense. See Magouirk v. Phillips, 144 F.3d 348, 359 (5th Cir. 1998) ("A state's purposeful waiver may also pose an obstacle to sua sponte

explicitly waived exhaustion was erroneous as a matter of law. See Carty Federal Habeas, No. 06-614, slip op. at 52. The state clearly considered exhaustion as a defense and chose not to exercise that defense for the close issue of whether Carty exhausted the claims contained in her Additional Further Response. The state has waived exhaustion, but in any case, Carty's substantive claims lack merit.

## B. Ineffective Assistance of Counsel

Carty contends that her trial counsel's assistance was ineffective. The Sixth Amendment guarantees a criminal accused the right to assistance of counsel, and "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). Under the Strickland standard, the Sixth Amendment right to effective assistance of counsel "is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700.

---

reliance upon a procedural default, and the nature of the state's alleged 'waiver' should be given consideration by the district court. . . . Where omission is the result of a purposeful or deliberate decision to forgo the defense, the district court should, in the typical case, presume that waiver to be valid.").

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms," by reference to "all the circumstances." Id. at 688; see also Sonnier v. Quarterman, 476 F.3d 349, 357 (5th Cir. 2007) (same). "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . ." Strickland, 466 U.S. at 688. In all cases, "[j]udicial scrutiny of counsel's performance must be highly deferential" and must avoid second-guessing. Id. at 689. We avoid the distorting effects of hindsight. Dowthitt v. Johnson, 230 F.3d 733, 743 (5th Cir. 2000). "We must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." Id. (quotation marks and alterations omitted).

Sufficient prejudice requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694. The deficient assistance must be "so serious as to deprive [her] of a fair trial, a trial whose result is reliable." Id. at 687.

"It bears repeating that," where the state habeas court ruled on the petitioner's ineffective assistance of counsel claim, "the test for federal habeas purposes is not whether [the petitioner] made [the required] showing." Schaetzle v. Cockrell, 343 F.3d 440, 444 (5th Cir. 2003). "Instead, the test is whether the state court's decision—that [the petitioner] did not make the Strickland-showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (Strickland), for

24

succeeding on [the petitioner's ineffective assistance of counsel] claim." Id. With these standards in mind, we now turn to Carty's claims of ineffective assistance of counsel.

### 1. Failure to notify Corona of his marital privilege

Carty asserts that trial counsel rendered ineffective assistance by failing to interview Corona and notify him of his right to assert his marital privilege not to testify against Carty. Under Texas law, the spouse of the accused has the right to refuse to testify against the accused in a criminal case. TEX. R. EVID. 504(b)(1).[11] Nonetheless, the privilege is the spouse's, not the accused's; the spouse may testify voluntarily for the state. Id.

Corona testified during the prosecution's case in chief. As discussed in greater detail above, he testified that Carty repeatedly claimed that she was pregnant, that none of those purported pregnancies resulted in the birth of a child, that he left her in May 2001, and that he did not believe Carty when she told him that she was pregnant in May 2001—shortly before she kidnaped and murdered Rodriguez. The prosecution emphasized his testimony to explain Carty's motive and provide the context for her otherwise inexplicable crime.

If permitted to refuse to testify, Corona attested that he would have exercised the option:

> I did not want to get involved in the trial or to testify against Linda, but when the prosecutor's office called me to testify, I thought that I had to testify and that I had no other choice. Neither Mr. Gerry Guerinot nor Ms. Windi Akins talked to me before I testified at Linda's trial. It was never explained to me before I testified that in

---

[11] Rule 504(b)(1) provides: "In a criminal case, the spouse of the accused has a privilege not to be called as a witness for the state." "The privilege not to testify may be claimed by the person or the person's guardian or representative but not by that person's spouse." TEX. R. EVID. 504(b)(3).

Texas there is a marital privilege and that under that privilege I had the right to refuse to testify at Linda's trial. If Linda's attorneys had explained to me or informed me about this marital privilege, I would have refused to testify at Linda's trial unless Linda's attorneys had asked me to do so.

Trial counsel neither informed Corona of the potential availability of a marital privilege nor interviewed him to establish the factual predicate. Although Corona was on the state's witness list, Guerinot admitted that, "[i]n my representation of Linda, I did not contact her husband Jose Corona prior to trial. I assumed that my investigator John Castillo would speak with him." Castillo, however, "never spoke to Corona." Guerinot also conceded that "I never attempted to inform Jose Corona that he had the right as her husband to not testify."

The district court held that "[z]ealous counsel should have interviewed Corona before trial and provided him the information necessary to try exerting [sic] the marital exemption." Carty Federal Habeas, No. 06-614, slip op. at 97. It held, however, that trial counsel's deficiency did not sufficiently prejudice Carty's defense to warrant relief. We agree that although trial counsel performed objectively unreasonably by failing to interview Corona to determine if he could or would assert a marital privilege, that omission did not prejudice Carty's defense.

The state does not disagree that trial counsel's failure to inform Corona of the potential availability of the marital privilege fell below the objective standard of reasonableness; instead, it argues only that Carty suffered no Strickland prejudice as a result of trial counsel's deficient investigation. The state provides two reasons why Carty was not sufficiently prejudiced, both of which she disputes. First, Corona was not Carty's common-law husband, so the

26

state trial court would not have permitted him to assert the marital privilege. Second, in any case, Corona's testimony did not render the jury's guilty verdict unreliable.

Both Corona and Carty agree that they shared a common-law marriage. "Common law marriages have been recognized in Texas since 1847." Russell v. Russell, 865 S.W.2d 929, 931 (Tex. 1993). The elements of a common-law or informal marriage, as codified in § 2.401 of the Texas Family Code, are "(1) an agreement to be married, (2) after the agreement, the couple lived together in [Texas] as husband and wife, and (3) the couple represented to others that they were married." Id. at 932.[12] "Proof of cohabitation and representations to others that the couple are married may constitute circumstantial evidence of an agreement to be married." Id. at 933.

The district court held that "the record does not show that, given the information he had, that trial counsel could have made a plausible argument that would allow Corona to exert [sic] his marital privilege." Carty Federal

---

[12] As currently codified, the Texas statute establishing informal marriage provides:
(a) In a judicial, administrative, or other proceeding, the marriage of a man and woman may be proved by evidence that:

. . .

    (2) the man and woman agreed to be married and after the agreement they lived together in this state as husband and wife and there represented to others that they were married.
(b) If a proceeding in which a marriage is to be proved as provided by Subsection (a)(2) is not commenced before the second anniversary of the date on which the parties separated and ceased living together, it is rebuttably presumed that the parties did not enter into an agreement to be married.

TEX. FAM. CODE ANN. § 2.401. Regarding the presumption contained in subsection (b), the state's prosecution of Carty was commenced prior to the second anniversary of the date that Carty and Corona separated; however, the state habeas application and present federal habeas litigation were not commenced within that time frame. Because the state does not argue that the adverse presumption contained in § 2.401(b) applies to this case, we do not rule on its applicability to the present case.

Habeas, No. 06-614, slip op. at 96; see also id. at 97 ("[T]he mixed record does not suggest that the trial court would have allowed Corona to avoid testifying."). The district court based its conclusion in part on the record of mixed statements by Carty and Corona, on Carty's statements about the termination of their relationship after Corona moved out, and on the absence of prior attempts to authenticate officially their marriage or to seek a divorce.

The district court in part misconceives Texas law as it applies to the evidence in this case. Although Carty's and Corona's mutual conclusory assertions that they have a common-law marriage "[are] not sufficient, standing alone, to establish a common law marriage," Tompkins v. State, 774 S.W.2d 195, 209 (Tex. Crim. App. 1987), it is undisputed that they lived together for approximately three years, from 1999 to 2001. The record contains evidence of multiple representations to others that they were married during the period of their cohabitation. For example, Corona attested that, during the period of their co-habitation, "I would introduce Linda as my wife, and she would introduce me as her husband." The difficult prong, as nearly always is the case, is the first: whether there was an agreement to be married. There is an indistinct record as to this prong. Carty has pointed the court to no direct evidence or statements that she and Corona agreed to be married. Yet, such an agreement can be inferred from the spouses' public statements and their cohabiting. See Russell, 865 S.W.2d at 932. The fact that both Carty and Corona assert that they had a common-law marriage, although not dispositive, lends credence to their claim—typically, the spouses dispute their status.

The evidence to the contrary, on which the district court relied, is not pertinent to the analysis in this case. While some statements show that they

may not have always referred to themselves as being married, Texas law does not require that the purported spouses always refer to themselves as married—undertaking each requirement of informal marriage consummates the union and renders additional or contradictory statements superfluous. See id. Even if Carty may have been planning a wedding ceremony, the intention to have a formal proceeding does not automatically disprove the existence of a common-law marriage. See Hinojos v. R.R. Ret. Bd., 323 F.2d 227, 231 (5th Cir. 1963) ("[T]here is nothing necessarily inconsistent with an agreement presently to enter into a common-law marriage and an intention later to have performed a ceremonial marriage."); Tompkins, 774 S.W.2d at 209 ("The fact that they might have intended to go through a ceremonial marriage at sometime in the future does not necessarily negate the inference that they believed that they were married common law."). Nor, as the district court erroneously referenced, does a later separation, a statement by one or both spouses that no marriage exists, or the spouses' failure to otherwise authenticate their marriage disprove or dissolve an established common-law marriage. See State v. Mireles, 904 S.W.2d 885, 889 (Tex. App.—Corpus Christi1995, pet. ref'd) ("[O]nce a common law marital status exists, it, like any other marriage, may be terminated only by death or a court decree; once the marriage exists, the spouses' subsequent denials of the marriage do not undo the marriage.").

On this record, considering Carty's and Corona's widely disseminated representations that they were married and the fact that during trial, even the prosecutors claimed that they were married,[13] Carty may well have established that she was married to Corona and that, but for her counsel's ineffective

---

[13] It is difficult for the state to now complain that Carty's assertion is surprising.

assistance, Corona would have exercised his marital privilege not to testify. Ultimately, however, we need not decide the question whether Carty and Corona were married because Carty fails on the prejudice prong of her ineffective assistance claim.

Carty bears the burden of showing a reasonable probability of a different result had Corona not testified. Although this is a close case, she has not made the requisite showing that his testimony rendered her conviction "fundamentally unfair or unreliable." Ransom v. Johnson, 126 F.3d 716, 721 (5th Cir. 1997) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Corona's testimony was undoubtedly damaging to Carty's defense, but it did not render her conviction fundamentally unreliable. His testimony provided motive and context for the crime. He testified that Carty wanted to have a child and frequently lied about being pregnant. He provided the best evidence of their break up a mere two weeks before Rodriguez's murder, of her statements at that time that she was pregnant, and of his belief that she was lying about being pregnant. Corona also testified that Carty called him numerous times on May 15—the day prior to the kidnaping and murder—and on May 16—the day of the crimes—to inform him that she was having his baby boy. It is an obvious and no small inference that Carty kidnaped Rodriguez's baby and killed Rodriguez to prove to Corona that she had birthed his son and thereby reestablish their relationship.

The prosecutors emphasized Corona's testimony in their closing remarks, particularly "that every time [he] tried to end [their relationship], Carty announced she was pregnant" and that "[w]hat [Carty] wanted, . . . needed, was [the baby] because her life was falling apart and she needed the baby to bring it back together again." The state concedes that "Corona provided motive and context for what would otherwise be a wholly inexplicable crime"—it was the

"evidence of what drove the defendant to commit such a brutal crime." As Guerinot summarized, Corona's testimony "hurt Linda's case." The district court thus appropriately concluded that Corona's testimony "would be persuasive to the jury" and "was obviously important to the prosecution."

Yet, while Corona's testimony may have been damaging to Carty's defense, the Strickland prejudice test carries a higher standard. Trial counsel's failure to notify Corona that he did not need to testify must have "a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." Strickland, 466 U.S. at 695–96. We affirm the district court's conclusion that Corona's testimony provided nuance to the case but did not alter the entire evidentiary picture. The evidence of Carty's guilt was overwhelming, even absent Corona's testimony, and his testimony, in most regards, only corroborated other sources. Corona's testimony was not necessary to prove, let alone relevant to, any of the elements of capital murder. More importantly, trial testimony from witnesses other than Corona revealed, inter alia, that in the days leading up to the kidnaping and murder, Carty told Mathis, Meyers, and Bancroft that she was pregnant. Neither Meyers nor Bancroft, however, thought she looked pregnant. Carty had also acquired baby items that she stored in her car, despite the fact that she was not pregnant. In addition, Carty masterminded the planned kidnaping—recruiting her accomplices, inviting them into her home to see the layout (which mirrored the target home), calling the kidnapers during the abduction, and then entering Rodriguez's home to take the baby, telling them repeatedly that she needed the baby, and directing them to tie up Rodriguez and put her in the trunk of the car—and killed Rodriguez by placing a bag over her head. While this other evidence may not have shown as

31

directly why Carty wanted Rodriguez's baby, it nonetheless shows that she wanted the baby.[14]  Although Corona's testimony was obviously damaging to Carty's defense, we conclude, based on the totality of the evidence, that Carty has not shown that but for trial counsel's deficient failure to advise Corona of his marital privilege there was a reasonable probability that she would not have been convicted of capital murder.

### 2. Failure to investigate and present additional mitigation evidence

Carty also argues that trial counsel was ineffective because counsel failed to investigate or present significant mitigating evidence.  In Strickland, the Supreme Court addressed an ineffective assistance claim based on an attorney's failure to investigate and present mitigation evidence.  The Court "noted that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Sonnier, 476 F.3d at 358 (citing Strickland, 466 U.S. at 691); see also Miniel v. Cockrell, 339 F.3d 331, 344 (5th Cir. 2003) ("[G]enerally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character.").  "Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment."  Riley, 339 F.3d at 316.  "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult

---

[14] In fact, trial counsel's unimpeached trial strategy was to challenge the evidence showing Carty's intent to kill, not her involvement in the kidnaping and murder.  Corona's testimony was thus not relevant to the most prominently disputed element of Carty's case.

and juvenile correctional experience, and religious and cultural influences." Wiggins v. Smith, 539 U.S. 510, 524 (2003). Sometimes, however, "[i]nvestigations into mitigating circumstances may reasonably be limited where the defendant fails to call witnesses to his lawyer's attention." Wiley v. Puckett, 969 F.2d 86, 99 (5th Cir. 1992). As the Supreme Court explained in Strickland,

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. . . . In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions . . . .

466 U.S. at 691. Thus, although a defendant's obstreperousness will not justify a complete failure by appointed counsel to investigate and present mitigating evidence in all cases, see Sonnier, 476 F.3d at 358 ("[The defendant's] refusal to consent to their undertaking more extensive and in-depth discussions with his family and acquaintances to determine the nature and extent of the mitigation evidence available was not reasonable grounds for their failure to do so."), "[t]he scope of the attorney's duty to investigate may be limited by a defendant's lack of cooperation," Randle v. Scott, 43 F.3d 221, 225 (5th Cir. 1995).

When considering Strickland prejudice, we review "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." Williams v. Taylor, 529 U.S. 362, 397–98 (2000); see also Wiggins, 539 U.S. at 534 ("[W]e reweigh the evidence in aggravation against the totality of available mitigating evidence."); Strickland, 466 U.S. at 695 ("[T]he question

is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.").  In this re-weighing, the brutality of the crime is relevant but does not automatically trump additional mitigating evidence.  See Gardner v. Johnson, 247 F.3d 551, 563 (5th Cir. 2001).

Carty asserts that trial counsel failed to investigate or present mitigating testimony from Corona, Mathis, Dr. Brown, Carty's family and friends, and acquaintances on St. Kitts and failed to investigate and present that Carty suffered from posttraumatic stress disorder after being the victim of a sexual assault, becoming pregnant, and giving her baby up for adoption.

The state habeas court ruled on some of these claims.  In particular, in her initial state habeas application, Carty raised trial counsel's failure to investigate and present additional mitigating testimony from her family members who testified and any mitigating testimony from her other family members.  The CCA concluded that trial counsel was not ineffective:  "Trial counsel cannot be considered ineffective for an alleged failure to investigate and present mitigating evidence . . . in light of counsels' investigation and presentation of thorough punishment evidence, including testimony concerning [Carty's] family background and support, positive personal characteristics, positive activities, work ethic, and her parenting abilities . . . ."  The court also concluded that Carty had not shown prejudice:  "[Carty] fails to show harm, if any, so that the outcome of the proceedings would have been different if the witnesses proffered on habeas [[her] mother, daughter, two sisters, and brother] had been presented at trial, based on the fact that three of the proffered witnesses [mother, daughter, sister] actually testified at trial and that the proffered testimony was essentially the

same as evidence presented at trial." Bolstering its conclusion, the court weighed Carty's and her family's lack of cooperation: "[Carty] fails to show ineffective assistance of trial counsel based on the alleged failure to investigate and present mitigating evidence, especially in light of [her] repeated failure to cooperate with counsel, [her] refusal to give counsel the name of potential witnesses, [her] instruction not to contact her family, and the failure of [her] daughter to appear in court without the trial court issuing a writ of attachment for her appearance." As noted above, we review the state court's conclusions and the factual findings contained therein under AEDPA's deferential standard. See § 2254(d). For Carty's remaining claims, we review de novo. See Henderson, 333 F.3d at 598.

Carty asserts that trial counsel failed to investigate and present mitigation testimony from her family. Trial counsel presented some mitigating evidence, including the testimony of Carty's mother Enid, sister Isalyn, and daughter Jovelle. Carty offers that, with better preparation, these witnesses would have presented a more vivid picture of Carty as a generous and caring human being. See Walbey v. Quarterman, 309 F. App'x 795, 804 (5th Cir. 2009) ("[T]he mitigating evidence omitted by [trial counsel] during [the applicant's] sentencing overwhelms the 'scant' evidence, 'bereft in scope and detail,' that was presented."). Although trial counsel did not conduct extensive interviews with these witnesses, they obtained a writ of attachment to secure Jovelle's testimony, and, moreover, Carty's complaint about trial counsel's preparation of these witnesses boils down to a matter of degrees—she wanted these witnesses to testify in greater detail about similar events and traits. We agree with the

district court that Carty has not shown any deficiency in trial counsel's preparation of Enid, Isalyn, and Jovelle. See Dowthitt, 230 F.3d at 743.

Carty also asserts that trial counsel performed ineffectively by not contacting Carty's other family members, including Sonia Carty Jackson, Verna Connor, Yvette Jacqueline Carty-Innes, Boyce Carty, and Clarence Eugene Carty—all of whom now attest that they were willing to testify about Carty's dynamic life, intelligence, and generosity. Such testimony would have overlapped considerably with the testimonies of Enid, Isalyn, and Jovelle. Carty's claim is again that trial counsel did not present enough mitigating evidence. We agree with the district court that Carty has not shown any deficiency related to her proffer of cumulative evidence. See id. In addition, with the exception of Verna, Carty refused to notify trial counsel about her relatives: Guerinot attested that "Ms. Carty did not provide me with names of people who would testify on her behalf. Ms. Carty did not even want her family to testify but I approached them anyway because I thought their testimony was important." Carty's own actions and statements undermine her claim of ineffective assistance related to mitigating testimony from other family members. See Randle, 43 F.3d at 225; Wiley, 969 F.2d at 99. The CCA's conclusion—that trial counsel's handling of the witnesses who testified and failure to contact Carty's other relatives, who would have testified similarly, did not prejudice Carty's mitigation defense—was not an unreasonable determination of the facts in light of the evidence presented in the punishment phase and was not an unreasonable application of or contrary to clearly established, Supreme Court-determined federal law. See Neal v. Puckett, 286 F.3d 230, 247 (5th Cir. 2002) (deferring to state habeas court determination that

"the additional evidence was not substantial enough to outweigh the overwhelming aggravating circumstances" where "[a]lthough the additional mitigating evidence was of a significantly better quality than that actually presented, much of it was similar in nature to the original evidence").

For the remainder of Carty's claim of ineffective assistance of counsel based on failure to investigate and present mitigating evidence, which we review de novo, we conclude that Carty has failed to show Strickland prejudice. The omission of Corona's and Mathis's proffered punishment-phase testimony was not prejudicial. Neither trial counsel nor the state has offered sufficient justification for trial counsel's failure to interview Corona or Mathis or to place them on the stand for purposes of mitigation. Corona undisputedly resided with Carty for three years prior to the kidnaping and murder and was Carty's common-law husband, while Mathis was Carty's DEA agent with direct knowledge of her work for the government. Corona attests that he would have testified to the jury that Carty "did not deserve the death penalty" and that he did not "believe she is an aggressive person or a threat to society." Mathis attests that "[t]he Linda I know is not a violent person, let alone a cold-blooded murderer." Mathis would also have provided some favorable if mixed testimony about her performance as an informant for the DEA. Based on the totality of the evidence, and weighing the relatively unpersuasive nature of Corona's and Mathis's testimony, some of which would have been cumulative,[15] against the circumstances of the crime and other evidence, Carty has failed to show that their testimony would have resulted in a life sentence.

---

[15] Mathis's testimony would have been largely cumulative of his trial testimony. For example, Mathis testified during the guilt/innocence phase of trial that "I've known Linda for a long time and I did not believe that she could do something like this."

Carty next asserts that trial counsel rendered ineffective assistance by failing to investigate or procure testimony from her friends and acquaintances on St. Kitts. The state does not dispute that these witnesses could show that Carty was "well-liked and well-known," "involved in church and politics," a "good teacher," and not "violent or aggressive or even rowdy" while growing up and working in St. Kitts.[16] Indeed, these witnesses would have provided a much more nuanced and detailed vision of Carty's life and contributions to the St. Kitts community. See Riley, 339 F.3d at 316. Yet, most, although not all, of Carty's supporters on St. Kitts had little contact with Carty in the two decades since she left there—as the district court noted, the affidavits "have been prepared by people removed both in time and geographic location from her life at the commission of the capital murders." Carty Federal Habeas, No. 06-614, slip op. at 112. In fact, their proffered testimonies of her good character appear "weak and stale" when compared to the person she had become—a person who stole cars; organized drug deals, burglaries, and kidnapings; and committed murder. Id. Furthermore, the testimonies of Enid, Isalyn, and Jovelle—based on more recent observations and interactions with Carty in Texas—presented at least some of the proffered information to the jury. And, again, Carty's obfuscation contributed to trial counsel's alleged deficiency; she did not inform trial counsel that she was a foreign national or provide counsel with her contacts

---

[16] Each of the potential witnesses attested that, if asked, he or she would have traveled to Texas to testify during Carty's trial. The St. Kitts consulate stated that it would have assisted with visas and travel. Thus, we assume that the witnesses would have testified if called. See Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985) ("In order for the appellant to demonstrate the requisite Strickland prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial.").

in St. Kitts. Although the proffered testimonies would have given more detail and more focus to the mitigating evidence, in light of the totality of the evidence presented at trial, they were not of sufficient quality and force to establish a reasonable probability that, had the jury heard them, it would have elected to impose a life sentence.

Carty adds that trial counsel was ineffective for failing to investigate and present mitigating evidence showing that she was the victim of a rape and that she became pregnant as a result of that rape, birthed a child, gave it up for adoption, and now suffers from chronic post-traumatic stress disorder as a result. Carty did not present this mitigation argument to the district court. See Carty Federal Habeas, No. 06-614, slip op. at 88. At most, she argued that her rape was a justification for why she was uncooperative with trial counsel. Thus, Carty has abandoned this line of argument. See Johnson v. Puckett, 176 F.3d 809, 814 (5th Cir. 1999) ("We have repeatedly held that a contention not raised by a habeas petitioner in the district court cannot be considered for the first time on appeal from that court's denial of habeas relief.").[17]

Finally, Carty argues that trial counsel ineffectively prepared Dr. Brown for testimony and cross-examination about Carty's future dangerousness during

---

[17] Even if Carty did not abandon this claim, she has not shown either deficient performance or prejudice. Carty did not inform trial counsel that she gave birth to a child that was conceived as a result of rape. And, the jury heard testimony and argument about her rape and resulting child birth, even as it related to mitigation. For example, after Dr. Brown testified that she informed him about the rape, trial counsel stated during closing arguments:

> Linda Carty, according to the report by Dr. Brown—you may say, as far as mitigating goes, you may ask yourself, "You know what, I wonder if the fact that she reported that she gave birth to a child that was the result of a sexual assault and gave that up for adoption, if that may have triggered something to cause her to do what she did?" I mean, it could be anything from any source whatsoever. And the law does not require that you leave your common sense out there on the courthouse steps.

the punishment phase. Because neither we nor the district court granted Carty a COA on this issue, we lack jurisdiction to consider this claim. See 28 U.S.C. § 2253(c); Sonnier v. Johnson, 161 F.3d 941, 946 (5th Cir. 1998) ("Compliance with the COA requirement of 28 U.S.C. § 2253(c) is jurisdictional . . . .").

## C. Denial of An Evidentiary Hearing

Lastly, Carty argues that the district court abused its discretion by denying her request for an evidentiary hearing on the exhaustion issue. Having considered Carty's proffer in connection with that request, we perceive no abuse of discretion in the district court's ruling. See Schriro v. Landrigan, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

## IV. CONCLUSION

For the above-stated reasons, we AFFIRM the district court's judgment.