# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

——————

No. 14-51288

——————

In re: CLINTON LEE YOUNG,

Movant

United States Court of Appeals
Fifth Circuit

**FILED**
June 8, 2015

Lyle W. Cayce
Clerk

——————————

On Motion for Authorization to File
Successive Petition for Writ of Habeas
Corpus in the United States District Court
for the Western District of Texas

——————————

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Clinton Lee Young was convicted of the capital murders of Doyle Douglas and Samuel Petrey on March 27, 2003. He was sentenced to death on April 14, 2003. He now seeks authorization to file a successive petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2244(b)(2)(B). For the reasons explained below, Young's motions for authorization and for a stay of execution are denied.

## FACTS AND PROCEEDINGS

### I. The Murders

The following summary of the relevant facts comes from the opinion and order of the Texas Court of Criminal Appeals ("TCCA"), affirming Young's conviction on direct appeal.

On November 24, 2001, [Young], Darnell McCoy, Mark Ray, and David Page decided to drive to Longview to buy some

marijuana. Because none of them owned a car, [Young] asked [Doyle] Douglas if he could borrow his car. Douglas refused, but offered to drive the group to Longview himself. When they arrived at their destination, [Young] shot Douglas in the head with a .22 caliber semi-automatic handgun. Ray testified that [Young] threatened the remainder of the group by saying, "If y'all don't get him in the trunk, you're going to be like him." Ray assumed that [Young] meant that they would also be shot. Ray, McCoy, and Page put Douglas in the trunk.

The group then got back in the car and [Young] drove off. [Young] later told Ray that he needed Douglas's car to go see his girlfriend. [Young] stopped the car in a remote wooded area near a creek and ordered Ray, Page, and McCoy to take Douglas's body out of the trunk. The men complied and dragged Douglas's body down to the creek while [Young] smoked a cigarette. Page testified that [Young] told Ray that he was going to have to prove himself by shooting Douglas in the head. [Young] got a pillow from the car and held it against Douglas's head which was face-down in the creek. Ray shot Douglas in the head once more.

Ray testified that [Young] then drove to a gas station and told his companions that one of them had to go to Midland with him to see his girlfriend because "[i]f y'all squeal, you know, by the time I hear about it, your friend's going to be dead." Page volunteered to go, and [Young] took Ray and McCoy home. [Young] called his girlfriend, Amber Lynch, presumably to make arrangements to meet her, and learned that her father, Bart Lynch, was with her. Page testified that [Young] realized that Bart would recognize Douglas's car because Douglas and Bart knew each other. Thus, [Young] looked for another car to steal in Weatherford, but was unsuccessful.

The two then drove to Eastland and stopped at a Brookshire Brothers grocery store to get some gas. [Samuel] Petrey was walking back to his pick-up truck from the grocery store when [Young] abducted him at gunpoint. [Young] ordered Petrey into his truck and then drove off with Page following in Douglas's car. [Young] later stopped at a rest area and telephoned Amber. Page testified that [Young] decided that they would slit Petrey's throat and "leave him somewhere."

[Young] got back in the truck, and Page continued to follow in Douglas's car until they could find a location to abandon Douglas's car. Page testified that Petrey told [Young] that he was familiar with the area and knew of a place to hide Douglas's car.

According to Page, Petrey was compliant and helpful. Petrey directed them to another wooded remote area, and Page parked Douglas's car in some bushes. [Young] then fired several shots into the car in an attempt to "blow it up" but was unsuccessful.

[Young], Page, and Petrey then drove toward Midland. They made several stops and eventually stopped at a Wal-Mart, where [Young] ordered Petrey to buy a $500 assault rifle. Because of the waiting period, Petrey was not able to leave with the rifle. When they returned to the truck, [Young] called Amber again. Bart got on the phone with [Young] and told him that he knew what had happened to Douglas. Bart indicated that the police were looking for [Young] and Page. He also indicated that Page's father knew about the situation and wanted Page to call him. Page then called his father and, after speaking with him, told [Young] that he needed to be dropped off so that he could turn himself in. [Young] refused and instead drove to a "pump-jack site," where he told Page that they needed to "get rid of all the evidence."

Page testified that Petrey was leaning up against his truck smoking a cigarette when [Young] walked up to him and said, "Sorry, Sam, you know too much. You got to die." [Young] then shot Petrey twice. Some blood splashed on the bumper of Petrey's truck, so [Young] ordered Page to clean it off. The two then left in Petrey's truck. After discussing what to do next, Page finally persuaded [Young] to drop him off at an IHOP so he could turn himself in.

*Young v. State*, No. AP-74643, 2005 WL 2374669, at *1–3 (Tex. Crim. App. Sep. 28, 2005) (en banc) (unpublished).

Additionally, at trial, the defense elicited testimony that both called into question Young's guilt and suggested that Page may have killed Petrey. For example, Christopher McElwee testified that, while in jail following the murders, Page said he was wearing gloves when he shot Douglas. *Young v. Stephens*, No. MO-07-CA-002-RAJ, 2014 WL 509376, at *4 & n.75 (W.D. Tex. Feb. 10, 2014) *opinion vacated in part*, No. CIV. MO-07-CA-002, 2014 WL 2628941 (W.D. Tex. June 13, 2014). An expert testified that Page's, but not Young's, DNA was found on gloves at the murder scene. *Id.* at *3 & n.67, *4 & n.74. Further, the defense presented testimony that Page had opportunities

to leave Young after the Douglas murder, but before the Petrey murder, but did not, further suggesting he was a willing participant in the Petrey murder. *See id.* at *4 & n.76.

## II. Post-Trial Proceedings

The TCCA affirmed Young's conviction on direct appeal. Young filed his first state habeas claim while his direct appeal was pending, alleging fourteen errors. The state court held four days of hearings and thereafter recommended denying relief. A few months later Young moved to add claims fifteen to twenty-two to his request for relief. The TCCA reviewed the record and concurred with the trial court's recommendation to deny relief; it also dismissed Young's new claims as an abuse of the writ because they constituted a subsequent writ application. *Ex Parte Young*, No. WR-65,137-01, 2006 WL 3735395, at *1 (Tex. Crim. App. Dec. 20, 2006) (unpublished). Young filed a petition for a writ of habeas corpus in the district court for the Western District of Texas on December 20, 2007. On October 20, 2008, Young filed a motion to stay his case in order to return to state court and advance new prosecutorial misconduct claims. *Young*, 2014 WL 509376, at *16. The motion to stay was granted on February 25, 2009. *Id.* Young then filed his second subsequent writ of habeas corpus with the state court.

Young asserted a variety of claims, including that the government withheld information about Page and Ray's plea agreements and that his trial counsel was ineffective for failing to prove that Page and Ray shot Douglas. *Id.* at *16. After the TCCA certified two issues, the trial court held five days of evidentiary hearings to consider whether the prosecution withheld evidence related to plea negotiations with Page and Ray, as well as whether the prosecution withheld impeachment evidence that could have been used in cross-examination of A.P. Merillat. *Id.* at *17; *Ex Parte Young*, No. WR-65,137-03, 2009 WL 1546625 (Tex. Crim. App. June 3, 2009) (unpublished). The state

court recommended denying Young's petition for a writ on May 18, 2011, finding that there was no plea agreement with Ray or Page at the time they testified, that they testified accurately at trial, and that Young had abandoned his claims related to Merillat. *Young*, 2014 WL 509376, at \*22. The TCCA, concurring with the trial court's findings of fact and conclusions of law, denied Young's claim regarding the "prosecution's alleged failure to disclose exculpatory evidence." *Ex Parte Young*, WR-65,137-03, 2012 Tex. Crim. App. Unpub. 1360 (Tex Crim. App. Jun. 20, 2012) (unpublished).

On October 18, 2012, Young filed his second amended federal habeas petition. *Young*, 2014 WL 509376, at \*23. The district court denied this petition on February 10, 2014, issuing a comprehensive two-hundred page opinion. *Id.* at \*198–99. The district court considered Young's *Brady* claim that "the prosecution failed to disclose to petitioner's trial counsel that it had offered prosecution witnesses Page and Ray 'informal promises of leniency and of favorable plea agreements'" and that "the prosecution knowingly elicited false testimony from both Page and Ray denying the existence of any promises or deals." *Id.* at \*26.

First, the court noted that the state court had already heard "extensive live testimony" and found that there "were no plea agreements or promises of leniency made to either Page or Ray" and that "nether Page nor Ray testified falsely during petitioner's trial." *Id.* The court considered the testimony from Young's second successive state habeas proceeding, where both Ray and his mother testified that Ray was offered a five-year sentence in exchange for testifying. *Id.* at \*28. The district court, however, found that this testimony was refuted by several sources. The court found it persuasive that the relevant prosecutors and investigators denied making any plea offer. *Id.* More importantly, Ray's trial counsel testified that, though there were some

5

preliminary discussions about a plea agreement, he never construed those conversations as an actual plea offer. *Id.*

The district court also examined Page's testimony at the second successive state habeas proceeding. Before trial Page discussed a possible thirty-year plea deal with the prosecution. *Id.* at *29. This deal was conditioned on passing a polygraph test, which Page failed. *Id.* Consequently, Page's trial attorney did not believe that there was any plea agreement for Page. *Id.* Further, the prosecution denied making any plea offers to Page. *Id.* Page also testified that, though he hoped to receive leniency for cooperating, he understood that there was not an enforceable agreement. *Id.* The district court cited *Knox v. Johnson*, 224 F.3d 470, 482 (5th Cir. 2000), for the proposition that a witness's subjective hope of leniency in exchange for cooperating with the prosecution does not establish an agreement). *Id.*

Based on the foregoing, the district court found that "the state habeas court reasonably rejected as factually flawed petitioner's contentions that either Page or Ray had been offered a plea agreement or that promises of leniency had been made to Ray or Page to induce their trial testimony against petitioner." *Id.* at *30. Hence,

> petitioner failed to show the existence of any evidence at the time of petitioner's trial concerning secret plea agreements or promises of leniency that could have been used to impeach Ray's or Page's trial testimony. Petitioner's first claim does not satisfy the first or second prongs of *Brady* analysis, i.e., petitioner has failed to establish that any potentially beneficial information regarding undisclosed plea agreements or promises of leniency made to Ray or Page actually existed at the time of petitioner's trial. In addition, because petitioner failed to establish that Ray or Page furnished any factually inaccurate testimony at petitioner's trial, petitioner's first claim also fails to satisfy the first and third prongs of *Giglio/Napue* analysis, i.e., petitioner failed to show Ray or Page gave any false testimony or that prosecutors knew Ray or Page testified falsely.

*Id.*

## III. Young's New Evidence

### A. Evidence of Page's Plea Offer

On December 13, 2013, Young's counsel interviewed Russell Stuteville, who was in custody with Page before Young's trial. Stuteville allegedly told Young's counsel that Page not only used the word "we" when referring to the Petrey homicide but also admitted that he held Petrey at gunpoint on various occasions. According to Stuteville, once Page began meeting with the prosecution he changed his version of events to focus on Young's actions and no longer said "we" in reference to the murders. *Id.* Stuteville also said Page told him that he was going to plead guilty and receive twenty years of probation. This led Young's counsel to reinterview Page.

In a January 9, 2014, interview with Young's counsel, Page allegedly said that he entered into a plea agreement before Young's trial. After reviewing his plea agreement, however, he stated that his dates were wrong. Then, in another interview on February 21, 2014, Page allegedly admitted that the prosecution offered him an unconditional thirty-year plea bargain before Young's trial. In further interviews in April and May of 2014, Page allegedly clarified that the offer was verbal and involved comments such as "[g]ive me what I want and I'll give you what you want."

Similarly to Stuteville, Elias Gomez, who was also incarcerated with Young, stated in a February 20, 2014, interview that he "recalled Page saying he had a plea deal with the state." Young does not offer new testimony from Page's trial counsel or the prosecution to rebut their previous testimony that, despite discussions of plea bargains, there was never a plea bargain with Page.

### B. Evidence of "Inducements and Threats to Additional Witnesses"

Additionally, Young alleges that the prosecution failed to disclose that it offered inducements to or intimidated three government witnesses—Dano

Young ("Dano"), Joshua Tucker, and Patrick Brook.  Young alleges that, during an April 2014 interview, Tucker, for the first time, talked about certain inducements made by the prosecution.  Tucker was convicted of committing an unrelated robbery with Young shortly before the murders and was sentenced to four years' imprisonment.  During the sentencing phase of Young's subsequent murder trial, a government investigator, J.D. Luckie, transported Tucker and Brook to the courthouse to testify.  While driving them the investigator allegedly told Tucker and Brook that they might receive favorable treatment or reduced sentences if they testified for the prosecution. Additionally, the investigator allegedly told them that Young was a child molester and beat his girlfriend.  The former comment appears to be a reference to Young sticking his penis in an inmate's ear during a fight.  Tucker allegedly told Young's counsel that, but for the prospect of favorable treatment and the negative comments about Young, he would not have testified.  Brook also stated in an April 2014 interview that, after being arrested for the unrelated robbery he committed with Young, investigators told him he would receive ten years in prison or less if he cooperated during the sentencing phase of Young's trial.

Dano is Young's half-brother.  The day before he testified at Young's trial, Dano was arrested for drug possession.  According to Young's lawyer, during a May 2014 interview, Dano alleged that, while en route to Young's trial, he was told that if he cooperated with the case he might receive help on his pending drug charges.  Dano also received the impression from a government investigator that, if he didn't cooperate, his time in jail for the drug charges would be made more difficult or longer.  This investigator allegedly also told Dano "everyone knows [Young] is guilty" several times.  Young does not explain why he did not obtain this evidence from his brother earlier.

8

C. Newly Discovered Evidence that Page Shot Petrey

Lastly, Young argues that this court should authorize filing and consideration of his successive motion to evaluate the impact of "newly discovered evidence of innocence." This evidence concerns comments three individuals—James Kemp, John Hutchinson, and Amanda Williams— allegedly overheard Page make concerning his culpability for Petrey's murder.

On December 13, 2013, Young's investigator interviewed James Kemp, who was incarcerated with Page from late 2009 to early 2010. Young's counsel was allegedly prevented from interviewing him before Young's second state habeas hearing. Kemp alleged that, in 2010, before he testified at Young's second state habeas hearing, he was visited by two agents from the district attorney's office. These agents allegedly left Kemp with the impression that he would benefit by not testifying in Young's favor. He did not, and received a ten-month sentence, which ran concurrently to a prior sentence. Kemp would allegedly have otherwise testified that he overheard Page say, through the prison ventilation system, that the police didn't find fingerprints on the gun from the Petrey shooting because Page had worn gloves and that Page was lucky not to get a longer sentence, given what he actually did.

John Hutchinson was another witness Young allegedly tried to interview before his 2010 habeas hearing. Hutchinson told Young's counsel in a February 2014 interview that law enforcement had also paid him a "hostile visit" before the 2010 state habeas hearing, so he did not testify in Young's favor. Hutchinson told Young's counsel that he overheard Page say that he killed Petrey with a .22 caliber pistol. Hutchinson also stated that Page said he received a favorable deal compared to his accomplice, who was on death row.

Amanda Williams is the third witness who allegedly overheard Page making inculpatory comments. Williams claims that, before the murders, she overheard Page talking to McCoy about wiping bullet casings before loading

them to avoid leaving fingerprints.  Williams also claims that she overheard Page say that going to the police first after getting into trouble results in a "better deal."

## DISCUSSION

Based on the foregoing new evidence, Young moves this court to authorize the filing of a successive petition.  The authority for this court to act on a motion to authorize a successive petition rests on 28 U.S.C § 2244(b)(3)(C), which states: "[t]he court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection."  A prima facie showing is "a sufficient showing of possible merit to warrant a fuller exploration by the district court . . . . [If it] appears reasonably likely that the application satisfies the stringent requirements for the filing of a second successive petition," then the petition should be granted.  *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (quoting *Bennett v. United States*, 119 F.3d 468, 469–70 (7th Cir. 1997)).

The legal standard we apply to determine if Young has made a prima facie showing is set out in 28 U.S.C. § 2244(b)(1)–(2).  First, Young must show that his proposed claims were not presented in a previous petition.  28 U.S.C. § 2244(b)(1).  Second, his petition must rely on new evidence that "could not have been discovered previously through the exercise of due diligence" and, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28. U.S.C. § 2244(b)(2)(B)(i)–(ii).[1]

---

[1] Young could instead show, but does not argue, that his "claim relies on a new rule of constitutional law, made retroactive."  28 U.S.C. § 2244(b)(2)(A).

## I. Evidence of Page's Plea Offer Does Not Satisfy § 2244(b)(1)

The first question is whether the *Brady* claim related to Page's alleged plea offer is a second or successive petition that was presented in a prior application and must, therefore, be dismissed under 28 U.S.C. § 2244(b)(1). Young argues that the *Brady* evidence is new and may be considered because it "fundamentally alters" his previous *Brady* claim by alleging that the terms of the deal offered to Page were different and more favorable than Young previously understood.

The government contends that Young "raised substantially similar prosecutorial-misconduct . . . in the district court." Indeed, the government contends that Young has admitted as much in his motion: compare his description of his old claim, "[the prosecution] told Page he could get a fifteen-to-thirty year sentence if he passed a polygraph test and testified [against Young]"; with his new claim, "[Page admitted] that the state made him a 30-year plea offer before Young's trial that was never conditioned on him passing any polygraph test."

Young litigated the issue of whether the government withheld *Brady* evidence related to Page and Ray's settlement offers in his first successive state habeas petition. *Young*, 2014 WL 509376, at \*7 & n.170–83. The state trial court found that Ray's testimony regarding undisclosed plea offers was not credible and denied relief. *See id.* at \*22. The state court also found that Page did not receive a plea deal despite preliminary negotiations. *Id.* The district court carefully reviewed the state trial court's findings and found no error in its analysis. *Id.* Specifically, the district court noted that testimony from Page, Page's attorney, and the trial prosecutor, all demonstrated that Page was not offered a deal and that any hope of leniency in exchange for testifying was not *Brady* material. *Id.* at \*29. As noted above, Young's current *Brady* claim is

slightly different from his state habeas testimony in that he now alleges that Page's deal was not predicated upon passing a polygraph test, in contravention of the testimony of Page's attorney and the state prosecutor.

28 U.S.C. § 2244(b)(1) states that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed."[2]  The only difference between this claim and Young's prior federal habeas claim is that Young now alleges there was no polygraph condition attached to Page's deal.  But Young offers no evidence to rebut the defense and government attorneys' testimony to the contrary, or indeed Page's previous contrary testimony, which both the state trial court and district court found compelling.  This new gloss on a previous claim is insufficient to overcome § 2244(b)(1).

Even if we found that Young's claim was not presented in a prior application, it would still require dismissal because it does not satisfy the materiality prong of 28 U.S.C. § 2244(b)(2)(B)(ii).  This second deficiency is discussed below.

## II.  Evidence of "Inducements," "Threats to Additional Witnesses," and Page's Plea Offer do Not Satisfy 28 U.S.C. § 2244(b)(2)(B)(ii)

Young has not made the requisite showing under 28 U.S.C. § 2244(b)(2)(B)(ii) to raise a successful successive habeas claim concerning the alleged inducements and Page's new *Brady* testimony.  While it is likely that Young has also failed to show that he could not have discovered the inducement

---

[2] Young argues that his *Brady* claim was not raised in a prior petition because the allegation that Page's deal was not conditional "fundamentally alters" the evidence (citing *Vasquez v. Hillery*, 474 U.S. 254, 259 (1986); *Smith v. Quarterman*, 515 F.3d 392 (5th Cir. 2008); *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003)).  We find this argument unpersuasive.  First, these cases concern the issue of exhaustion, not whether a petition is successive.  Second, even if these cases did apply to a § 2244 analysis, Young's *Brady* evidence is not a changed focus to a new, previously unraised substantive area, it is a slight accumulation of evidence in support of a previous argument.  *See, e.g.*, *Smith*, 515 F.3d at 401–02.  Thus, these cases are not persuasive.

evidence with due diligence, *see* § 2244(b)(2)(B)(i), we need not reach that issue because the addition of Tucker, Brooks, and Dano's statements to the evidence adduced at trial, even when coupled with Page's new *Brady* testimony, does not establish by clear and convincing evidence that, but for the new evidence, no reasonable factfinder would have found Young guilty.

First, evidence of J.D. Luckie's, inducements to Brook and Tucker while transporting them to court could not have weighed on the jury's determination of guilt or innocence because those inducements occurred during the sentencing phase of trial. Young's motion states that Tucker "testified at Young's punishment-phase trial." The district court identifies this same testimony as relating to the sentencing phase. *See* 2014 WL 509376, at *16 & n.81. Young does allege that Brook was also offered inducements in a separate incident in 2001. Brook's testimony could conceivably have affected the jury's finding of guilt and so must be considered separately.

Second, Young's trial counsel introduced testimony from Christopher McElwee that, while in jail, Page made inculpatory statements about Petrey's death. Thus the jury already had evidence from which to conclude he was both biased and an alternative suspect in the Petrey shooting.

Third, even if one assumes that the jury completely discounted the testimony of the induced witnesses—Brook and Dano—and Page (because of his motive to fabricate), it would not mean that they could not have found Young guilty. McCoy and Ray testified that they observed Young shoot Douglas. They also testified that Young later admitted to shooting Douglas. McCoy was later able to lead police to Douglas's body. Bart and Amber Lynch and Rosemary Sanders each testified that Young admitted he stole Petrey's truck and that they saw Young with the truck, or a substantially similar truck. When Amber Lynch hugged Young she could tell that he was carrying a gun.

Petrey's wife testified about the timing of his disappearance, which generally fit the government's timeline. A store clerk at a gun shop testified that Young, Page, and Petrey were in his store the night of Petrey's murder trying to buy an assault rifle and that Young, not Page, appeared to be in charge. A security officer in a hospital parking lot saw Young, Page, and Petrey in Petrey's pick-up truck. When the police tried to apprehend Young, he fled in Petrey's truck. When Young was arrested, in Petrey's truck, he had a .22 caliber pistol in his possession. Tim Counce testified that this pistol fired the shell casings found inside Douglas's car and near Petrey's body.

Thus even the complete lack of Page, Brooks, and Dano's testimony at the guilt stage of trial would not prevent a reasonable jury from convicting Young. Young argues that the proffered inducements would lead the jury to distrust the entirety of the government's case. We disagree. There was too much corroborating evidence introduced at trial to call into serious question the integrity of the government's case-in-chief. Young has not met AEDPA's requirements for filing a successive petition, 28 U.S.C. § 2244(b)(2)(B)(ii). We need not, therefore address the other requirements for granting a successive petition under the AEDPA.

## III. Newly Discovered Evidence that Page Shot Petrey Does Not Satisfy 28 U.S.C. § 2244(b)(2)(B)(i)–(ii)

Lastly, we address the comments of three witnesses who allegedly heard Page make inculpatory comments regarding the Petrey murder. Young has not presented this evidence in either district or state court because he alleges he discovered it on December 13, 2013 (Kemp), February 2014 (Hutchinson), and April 2014 (Williams). Young argues that 28 U.S.C. § 2244(b)(2)(B) is satisfied because these claims were not presented in a prior application, could

not have been discovered previously, and would have altered the outcome of the trial.

Williams, before the 2001 murders, allegedly heard Page talking about how not to leave fingerprints on bullets and how going to the police before an accomplice will get you a better deal. Young makes no argument as to why he could not have discovered this evidence through due diligence in the preceding fourteen years. According to Young's counsel's proffer, Williams was socially acquainted with Young. Young does not allege that she was unavailable or otherwise unable or unwilling to talk with Young's counsel. Tellingly, when Young sets out his argument why he could not get testimony from Kemp and Hutchinson, he does not mention Williams. The requirements of 28 U.S.C. § 2244(b)(2)(B)(i), therefore, are not met because Young has not demonstrated that he could not have discovered Williams' testimony earlier through the exercise of due diligence. For the same reasons, Young's claim regarding Williams' testimony is also likely barred by the statute of limitations. 28 U.S.C. § 2244(d)(1). [3]

Kemp and Hutchinson testified at Young's 2010 state court habeas proceeding. Young alleges that he was denied access to them before they testified, while the government intimidated them into not revealing Page's statements by threatening them. Kemp, who was Page's cellmate for a period of time from late 2009 to early 2010, recanted his testimony and, in a December

---

[3] The Fifth Circuit has not decided whether 28 U.S.C. § 2244(d)(1) applies piecemeal to each claim or to the whole habeas application. Though we do not decide that issue today, it appears that applying the statute of limitations to each claim is consistent with AEDPA and the precedent of other circuits. *See, e.g.*, *Zack v. Tucker*, 704 F.3d 917, 921–24 (11th Cir. 2013) (en banc) (containing an in-depth discussion of the issue and collecting cases); *see also Capozzi v. United States*, 768 F.3d 32, 33 (1st Cir. 2014); *Bachman v. Bagley*, 487 F.3d 979, 984 (6th Cir. 2007); *DeCoteau v. Schweitzer*, 774 F.3d 1190, 1192 (8th Cir. 2014); *Mardesich v. Cate*, 668 F.3d 1164, 1171 (9th Cir. 2012); *Prendergast v. Clements*, 699 F.3d 1182, 1187 (10th Cir. 2012).

13, 2013, interview claimed he heard Page making inculpatory comments concerning wearing gloves during Petrey's killing and getting a good deal in his plea bargain.  Similarly, Hutchinson testified in February 2014 that he heard Page bragging about killing Petrey with a .22 handgun.

The first question is whether these claims are barred by the statute of limitations.  28 U.S.C. § 2244(d)(1)(D).  AEDPA's 1-year statute of limitations for newly discovered evidence runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  *Id.*  We have held that this means the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim.  *See Flanagan v. Johnson,* 154 F.3d 196, 199 (5th Cir. 1998).  The state argues that Young's 2010 cross-examination of Kemp and Hutchinson triggered the statute of limitations clock.  Young argues that he could not have discovered evidence of Page's statements because the government intimidated Kemp and Hutchinson before they testified in 2010.  The record does not explain why, four years later, Kemp and Hutchinson recanted their allegedly perjured testimony.

The government does not cite any precedent for the proposition that the opportunity to cross-examine a witness in a habeas proceeding triggers the date on which Young should have been aware of that witness's perjured testimony.  Absent evidence that Young knew or should have known that Kemp and Hutchinson lied in their 2010 testimony, we do not agree with the government's position.  This holding is consistent with the limited cases addressing a similar issue.  *See, e.g., Sierra v. Evans*, 162 F.3d 1174, 1998 WL 712578, at *2 (10th Cir. 1998) (table op.) (unpublished) (28 U.S.C. § 2244(d)(1)(D) clock started when newspaper reports about DEA chemist

surfaced, not when petitioner had an opportunity to cross-examine the chemist at trial); *Pacheco v. Artuz*, 193 F. Supp. 2d 756, 760–61 (S.D.N.Y. 2002) (holding that evidence of "perjured testimony . . . could not simply have been obtained through the exercise of due diligence" and, therefore, § 2244(d)(1)(D)'s trigger was when the witness came forward).   Hence we find that Young's claims regarding Kemp and Hutchinson are not time barred by 28 U.S.C. § 2244(d)(1)(D), or procedurally barred by 28 U.S.C. § 2244(b)(2)(B)(i).

Kemp and Hutchinson's statements, however, do not satisfy the requirements of 28 U.S.C. § 2244(b)(2)(B)(ii).   Young argues that Kemp and Hutchinson's testimony would color Page as untrustworthy and lead the jury to conclude that Page killed Petrey.   This argument overlooks important counterpoints that mitigate the impact of Kemp and Hutchinson's testimony. Kemp and Hutchinson's testimony itself is not trustworthy.   First, it comes more than a decade after trial.   Second, it is in direct contradiction to their 2010 testimony under oath.   There is little doubt that their credibility would be significantly diminished by cross-examination.

Young also ignores that the jury already heard testimony from McElwee that Page admitted to killing Petrey and other testimony that Page could have left Young before Petrey was murdered and thus was, arguably, a willing participant.   *Young*, 201 WL 509376, at *4 & n.75, *75 & n.76.   Further, Page testified at trial that, while he didn't have an explicit deal with the prosecution, he hoped his testimony would help him.   Thus the jury heard impeachment evidence that Page: 1) had a motive to lie; 2) could have abandoned Young but didn't; and 3) confessed to killing Petrey.   We need not rehash all the evidence adduced at trial, but reiterate that Young was arrested with the gun that produced the bullet casings found next to Petrey's body.   Based on this, we cannot conclude that the testimony of Kemp and Hutchison, if offered at trial,

17

"would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [Young] guilty of [Petrey's murder]."  28 U.S.C. § 2244(b)(2)(B)(ii).  We also doubt that, but need not consider whether, Young has "show[n] a linkage between the alleged constitutional error and the new facts of innocence."  *See Case v. Hatch*, 731 F.3d 1015, 1032 (10th Cir. 2013).

## CONCLUSION

Accordingly, for the reasons discussed, Young's motion for authorization to file a successive petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2244(b)(2) is DENIED, and his motion for a stay is DENIED.