# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-20574

United States Court of Appeals
Fifth Circuit

**FILED**
August 25, 2020

Lyle W. Cayce
Clerk

In re:  LINDA ANITA CARTY,

Movant

Motion for an order authorizing
the United States District Court for the
Southern District of Texas to consider
a successive 28 U.S.C. § 2254 application

Before OWEN, Chief Judge, and DENNIS and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Linda Carty was convicted on February 18, 2002 of capital murder and sentenced to death.  She seeks authorization from this court to file a successive habeas petition in the district court to bring several claims alleging that the prosecution engaged in misconduct by suppressing material evidence and by knowingly presenting false testimony.  Because Carty has failed to make the required prima facie showing that the new evidence supporting these claims could not have been discovered through the exercise of due diligence prior to her previous federal habeas petition, her motion for authorization is DENIED.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-20574

## I

This court and others have previously and exhaustively described the facts adduced at Carty's trial. *See Carty v. Thaler*, 583 F.3d 244, 248 (5th Cir. 2009); *Carty v. Quarterman*, No. 06-CV-614, 2008 WL 8104283, at *8 (S.D. Tex. Sept. 30, 2008); *Carty v. State*, 74,295, 2004 WL 3093229, at *2 (Tex. Crim. App. Apr. 7, 2004). We will repeat only those relevant to our adjudication.

Carty "was indicted by a Texas grand jury for the kidnaping and intentional murder of [Joana] Rodriguez." *Carty*, 583 F.3d at 246. The jury heard testimony that Carty orchestrated the kidnapping of Rodriguez and her infant child and murdered Rodriguez on May 16, 2001. *Id.* Although Carty did not herself enter the apartment in which Rodriguez and her child resided, the jury heard evidence that Carty—who lived, along with her boyfriend or common law husband Jose Corona, in the same apartment complex as Rodriguez—convinced others to rob the apartment by telling them Rodriguez and other members of the household had 200 pounds of marijuana and cocaine. *Carty*, 06-CV-614, 2008 WL 8104283, at *5–*6. Corona, along with others involved in the run-up to the robbery and kidnapping, testified at trial for the prosecution both about the motive and means behind Carty's plan to kidnap Rodriguez and her child and to murder Rodriguez.

Corona testified that Carty had lied in the past about being pregnant and that, before the kidnapping, Carty told him she would have a baby boy the next day. *Id.* at *8. Carty told others that she would be having a baby soon, including a DEA agent, Charles Mathis, for whom she had worked as an informant in the past. "At some point on May 14 or 15, [Carty] called Mathis and told him that she was going to have a baby boy." *Id.*

Josie Anderson, with whom Carty had been friends since 1997, testified that Carty had recruited her to participate in the robbery and that Carty told her that the plan was to rob a pregnant woman and her husband. *Id.* at *5–

No. 19-20574

*6. Chris Robinson, Josie Anderson's boyfriend, testified that he was recruited to participate in the robbery at the same time as another participant, Marvin Caston. *Id.* Robinson testified that because Carty's apartment and Rodriguez's apartment had the same layout, he, Caston, Josie Anderson, and Carty visited Carty's apartment so that they could familiarize themselves with its arrangement. *Id.* Caston corroborated this event and testified that he staked out Rodriguez's apartment and discussed with Carty kidnapping Rodriguez and her infant child. *Id.* Gerald Anderson, Josie's cousin, also agreed to participate in the robbery. *Id.* at *8. Zebediah Combs, Robinson's half-brother, confined to his residence in the same apartment complex with an ankle monitor, learned of the plan when Carty and several others came to pick up Robinson:

> "[Carty] had a job or something for them to do, and she was trying to recruit some people . . . . [I]t was a drug deal . . . . [F]or the drug deal she wanted a favor in return: and the favor was to bring the lady to her." "[P]art of the payment was showing [them] where the marijuana was, and she said she was going to pay them when they brought the lady to her." [Carty] explained that she wanted them to do the kidnapping because "her husband had got the lady pregnant." Once the others brought the pregnant woman to [Carty], she was "going to handle it from there."

*Id.* at *7 (internal citations omitted).

Ultimately, according to Robinson, it was he, Gerald Anderson, and Williams who carried out the robbery, entering the house with guns, while Carty waited outside. *Carty*, 583 F.3d at 248. Robinson testified that he saw Carty enter the apartment and leave with the infant. *Carty*, 06-CV-614, 2008 WL 8104283, at *9. Williams and Gerald Anderson brought Rodriguez out of the apartment and put her in the trunk of Robinson's car. *Id.* After the group left the apartment complex in two cars—including Carty in her own car—Williams opened Robinson's trunk and taped Rodriguez's mouth and hands at

Carty's direction. *Id.* at \*7, \*9–\*10. After returning to the apartment complex, the group argued because the men did not find the amount of drugs Carty had promised them and accused her of setting up a bogus robbery. *Id.* at \*10. After approaching the group, Comb testified that Carty excitedly told him that she got her baby. *Id.* at \*10. Several hours later, after the group separated, Robinson testified that he saw Carty "in the trunk" of his car, with "[h]alf her body . . . in the trunk," with "one leg on the ground and leg in the trunk," and that Carty "had a plastic bag over [Rodriguez's] head." *Id.* Robinson also testified that he ran up to the vehicle, saw Rodriguez was not breathing, and tried to remove the bag, but Rodriguez was already dead. *Id.*

The jury returned a verdict of guilty in Carty's capital murder trial and answered all three of Texas's "special issues" during the guilt phase in favor of sentencing Carty to death. *Carty v. Thaler*, 583 F.3d 244, 249, 251 (5th Cir. 2009). Carty's conviction and death sentence were affirmed on direct appeal, and her first round of state and federal habeas proceedings was unsuccessful. *Carty v. State*, 74,295, 2004 WL 3093229, at \*2 (Tex. Crim. App. Apr. 7, 2004); *Ex parte Carty*, No. WR-61,055-01 (Tex. Crim. App. March 2, 2005) (unpublished); *Carty v. Quarterman*, 345 F. App'x 897 (5th Cir. 2009) (denying request to expand COA granted by district court); *Carty*, 583 F.3d at 257–66 (denying relief on claims on which COA was granted).

Carty now seeks to file a second federal habeas petition, asserting that the prosecution (1) coerced Robinson, Caston, Mathis, and Gerald Anderson to submit false testimony; (2) withheld certain exculpatory and impeachment statements made by these witnesses; (3) failed to disclose preferential treatment for Caston in exchange for his testimony; and (4) presented false and misleading testimony of, and failed to disclose impeachment and exculpatory

4

No. 19-20574

evidence regarding, Comb.[1]  Carty argues that these claims are based on new evidence that was not available at the time of her previous federal habeas petition.

## II

The Antiterrorism and Effective Death Penalty Act (AEDPA) requires that "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A).  Where a claim is raised in a successive habeas petition and was not raised in a prior federal habeas petition, AEDPA requires that the claim be dismissed unless (1) the petitioner "shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (2) "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  *Id.* § 2244(b)(2)(A)-(B).

We may only authorize a successive petition to go forward in the district court if we determine "that the application makes a prima facie showing that the application satisfies the requirements of [AEDPA]."  *Id.* § 2244(b)(3)(C).  "A

---

[1] Carty raised the first three issues in a second state habeas proceeding.  *Ex parte Carty*, 543 S.W.3d 149, 150–51 (Tex. Crim. App. 2018).  The Texas Court of Criminal Appeals allowed the subsequent writ and remanded to the trial court for an evidentiary hearing because the affidavits Carty relied on in support of these claims were generated after the initial habeas petition, but ultimately denied relief on the merits.  *See Ex parte Carty*, WR-61,055-02, 2015 WL 831586, at *1 (Tex. Crim. App. Feb. 25, 2015); *Carty*, 543 S.W.3d at 150–51.  Carty raised the fourth issue in her third state habeas petition, which the TCCA rejected.  *Ex parte Carty*, WR-61,055-03, 2018 WL 4001302, at *1 (Tex. Crim. App. Aug. 22, 2018).

prima facie showing is 'a sufficient showing of possible merit to warrant a fuller exploration by the district court. If it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second successive petition,' then the petition should be granted." *In re Young*, 789 F.3d 518, 525 (5th Cir. 2015) (alterations omitted) (quoting *Reyes–Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001)).

Because Carty's application relies on new evidence as the basis for authorization, she must show that her petition is reasonably likely to satisfy AEDPA's two central requirements for a successive petition based on new evidence: First, that the new evidence relied on "could not have been discovered previously through the exercise of due diligence," and, second, that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(i)–(ii). In analyzing the first of these requirements—due diligence—we ask whether "due diligence at the time of [Carty's] first habeas petition would have led to the discovery of the facts [she] is relying on for the new claim[s]." *In re Davila*, 888 F.3d 179, 184 (5th Cir. 2018).

## A

In order to adequately evaluate whether Carty has made a prima facie showing that she could not have previously discovered the facts underlying her proposed successive petition, we set out first the evidence Carty proffers in support of her proposed petition. *See Davila*, 888 F.3d at 184.

Carty proffers several affidavits from trial witnesses and others, including participants in the robbery and kidnapping. Several of the affidavits recant various pieces of trial testimony or add relevant details that were omitted at trial. Robinson, the only trial witness who actually took part in the

robbery and Rodriguez's kidnapping, testified at trial that Carty instructed him, Gerald Anderson, and Williams "to kill everyone in the house except [Rodriguez]." *Carty*, CIV.A 06-614, 2008 WL 8104283, at *7.  In his affidavit, however, Robinson avers that Carty never in fact instructed the robbers to "kill all the guys in the apartment."  Robinson also states in his affidavit that, despite his trial testimony, Carty never told them to tape Rodriguez's hands and feet, he never in fact saw Carty place the bag over Rodriguez's head while she was in the trunk of his car, and Rodriguez was not actually dead when he ripped off the bag that was on her head.  Finally, Robinson avers that he failed to tell the jury that it was actually Josie Anderson, not Carty, who was the ringleader of the robbery and kidnapping, that there was never any plan to kill anyone, and that he believed Rodriguez's death had been an accident.  *Id* **21, 32**.  Caston, who was not a part of the ultimate break-in or kidnapping, also submitted an affidavit recanting trial testimony.  Caston testified at trial that he had staked out the apartment initially and heard Carty discussing kidnapping Rodriguez and her child, and that the group had a plan to drag Rodriguez out of the apartment.  He states in his affidavit, however, that it was actually Josie Anderson, not Carty, who first brought up the robbery; that there was never a plan to take Rodriguez or her child; and that Josie Anderson was the true ringleader, Gerald Anderson, who was not called as a witness in Carty's trial despite participating in the robbery and kidnapping, confirms the assertions in Robinson's and Caston's affidavits, stating that there was "never any plan to take the lady and the baby," that he never heard Carty talking about the baby, and that Carty was not the one who recruited Robinson nor did she talk Gerald Anderson into participating in the robbery.

The affidavits also discuss the conduct of prosecutors Connie Spence and Craig Goodhart during Carty's case. Robinson avers that Spence and Goodhart intimidated him, threatened him with the death penalty himself "if Linda

Carty did not get the death penalty," and required that he edit his testimony to fit their version of events. Robinson claims in his affidavit that he never saw Carty put a bag over Rodriguez's head; he testified at trial that he witnessed that event only at the insistence of the prosecutors. He also avers that he told the prosecutors repeatedly that he never saw Rodriguez dead in his car, but that they insisted he knew she was dead and he "just said what Goodhart and Spence wanted me to say."

Caston testified at trial that Spence and Goodhart did not threaten him in any way and that Carty initially brought up the crime. He states in his affidavit, however, that Goodhart and Spence threatened him with thirty years in prison if Carty did not get the death penalty and that Josie Anderson initially brought up the crime. **Ex. A-19 at ¶¶ 3–8**. Caston avers that he lied at trial about these facts and other details about the enterprise because of pressure from Spence and Goodhart. *Id.* **at ¶¶ 4, 7, 10, 11**.

Anderson, who ultimately refused to testify, states that "Spence went through a whole story of what she said happened and what I was supposed to know," but much of the information was either untrue or Anderson had no knowledge of it. **Ex. A-18 at ¶10**. For example, Anderson states that Spence wanted him to testify at trial that he was present when Carty supposedly said that she was going to "cut the baby out of" Rodriguez, that there was a preexisting plan to kidnap Rodriguez and her child, and that Carty recruited him and Robinson to perform the kidnapping. *Id.* **at ¶¶ 11–14**. According to Anderson, he refused to testify because he did not want to lie, but that leading up to that point, Spence had threatened to prosecute him instead or, if he agreed to go along, promising that "she would make [his] drug cases go away." *Id.* **at ¶¶ 15–19**.

Carty also submits an affidavit from Mathis, a former DEA agent who was familiar with Carty because of her previous work as an informant. **Ex. A-**

21. Mathis states that although he did not say anything false at trial, "Spence threatened [him] with an invented affair that I was supposed to have had with [Carty]" to induce him to testify. *Id.* at ¶¶ 19 – 20. Mathis states that he does not believe Carty could have committed the crime with which she was charged, does not believe she was a compulsive liar, and does not believe she was a cold-blooded murderer who was a danger to society, and he wanted to testify to that effect but was prevented from doing so. *Id.* at ¶¶ 27–28, 32. He also states that he wanted to testify about alleged police misconduct during the investigation of Carty by the Houston Police Department, but Spence prevented him from so doing. *Id.* at ¶ 26.

Finally, Carty proffers emails obtained during discovery in her subsequent state habeas proceedings between prosecutors in Carty's case discussing the need for Comb's testimony. Carty contends that these emails reflect that prosecutors had an undisclosed understanding with Comb that they would seek a reduction in Comb's sentence in federal court with the assistant United States Attorney in exchange for Comb's testimony in Carty's capital murder trial. **Ex. A-4; Ex. A at 33–36, 48–50**.

Carty argues that the portions of testimony recanted in these affidavits, as well as testimony to the effect that Robinson, Caston, and Combs were not promised anything or threatened to provide testimony, give rise to a claim under *Giglio v. United States*, 405 U.S. 150 (1972), that the prosecution knowingly proffered false testimony at trial. **Ex. A at 31–41**. Much of these same details from the affidavits, according to Carty, along with the alleged misconduct the prosecution engaged in while preparing these witnesses, give rise to a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), for suppression of evidence that would have been favorable to Carty; namely, that the true version of events reflects that Carty is far less culpable than the prosecution claimed at trial, and that much of this evidence would have been valuable

impeachment evidence regarding witnesses' motives for testifying against Carty. **Ex. A at 41–51**.

## B

At this stage, "[w]e do not address the merits of [Carty's] claims and only consider whether to excuse [her] procedural default of failing to raise them in [her] first federal habeas petition." *In re Swearingen*, 556 F.3d 344, 347 (5th Cir. 2009). In making this determination, we first ask whether Carty's new evidence could "have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i). "To succeed at this stage, [Carty] must make a prima facie showing that [she] could not have discovered, through exercise of due diligence, the facts predicating [her] new . . . claim[s] at the time [she] filed [her] first federal petition." *In re Davila*, 888 F.3d 179, 184 (5th Cir. 2018).

If the "newly discovered" recantations were not available when Carty filed her prior federal habeas petition, AEDPA requires that she make a prima facie showing that she could not have discovered the factual basis for these affidavits through the exercise of due diligence before she began her initial federal habeas proceedings in 2006. 28 U.S.C. § 2244(b)(2)(B)(i); *see also* BRIAN R. MEANS, FEDERAL HABEAS MANUAL § 11:28 (May 2020 Update) ("A state prisoner seeking permission to file a second or successive habeas motion must show some good reason why he was unable to discover the facts supporting the motion before filing the first habeas petition. . . . An applicant that merely alleges that he did not actually know the facts underlying his claim does not pass this test."). Though the burden is only for a prima facie showing of diligence, that burden rests with Carty. *Id.* Included in this showing is a requirement that Carty articulate a reason why the evidence was not available earlier. *See In re Young*, 789 F.3d 518, 527–28 (5th Cir. 2015). In *Young*, we denied authorization to file a successive habeas petition where, with respect to

one piece of evidence, the petitioner "ma[de] no argument as to why he could not have discovered this evidence through due diligence" in the fourteen years between his conviction and his successive habeas petition; the petitioner "was socially acquainted with [the witness]" and "d[id] not allege that [the witness] was unavailable or otherwise unable or unwilling to talk with [the petitioner's] counsel." 789 F.3d at 527–28.

As in *Young*, Carty has failed to articulate or allege any reason why she was unable to interview or otherwise communicate with the witnesses on whom she now relies. Carty argues rather that AEDPA's due diligence hurdle is met where an applicant alleges that a witness's recantation of false testimony has brought to light *Giglio* and *Brady* violations, citing *Young* for the proposition that "perjured testimony . . . could not simply have been obtained through the exercise of due diligence." 789 F.3d at 529 (citations omitted). However, this is taken out of context and misstates *Young*, which holds, in pertinent part, only that having had the opportunity to cross-examine a witness does not trigger the date on which a defendant "should have been aware of that witness's perjured testimony" for the purposes of AEDPA's one year statute of limitations for newly discovered evidence. *Id.* at 528. Rather, "[a]bsent evidence that [the defendant] knew or should have known" that the witness's testimony had been perjured at an earlier point, this date is triggered by the witness's recantation. *Id.* This argument is inapposite to the question of whether Carty has made a prima facie showing that she could not have discovered the factual basis for her current claims through the exercise of due diligence before she began her initial habeas petition.

Carty's argument that she has satisfied AEDPA due diligence under the *Brady* standard—that because the prosecution hid this information, it could not have been discovered earlier through the exercise of due diligence—is also unavailing. **Ex. A-1 at 25–28**. In *Davila*, we explained the distinction between

No. 19-20574

AEDPA's due diligence requirement and due diligence as it relates to a traditional *Brady* analysis: Though *Brady* requires "prosecutorial misconduct to be the reason for a defendant's failure to discover favorable, material evidence for use at trial," AEDPA requires due diligence at the time of the first habeas petition and asks whether such diligence "would have resulted in the discovery of the factual basis for the new claim such that it could have been included in the first petition." *In re Davila*, 888 F.3d at 184. Therefore, AEDPA's due diligence requirement "must be resolved prior to, and independently of, consideration of the similar elements of a *Brady* claim." *Id.*

Habeas petitioners must, regardless of the merits of their underlying *Brady* and *Giglio* claims, exercise diligence in seeking out the factual predicate for a claim ahead of their initial habeas petition. *See Davila*, 888 F.3d at 184–87; *see also Blackman v. Davis*, 909 F.3d 772, 778–79 (5th Cir. 2018) ("Blackman's *Brady* and *Giglio/Napue* claims rely on . . . previously undiscovered facts and are therefore within the purview of the statutory language" of AEDPA, such that "the statutory requirements for a successive petition must be considered prior to evaluation of the merits of the petitioner's" claims.). Because Carty "does not allege that [these witnesses] [were] unavailable or otherwise unable or unwilling to talk with . . . counsel," and because Carty was aware of the identity of these witnesses after trial at the latest, she has failed to make out a prima facie showing of diligence under AEDPA.[2] *In re Young*, 789 F.3d at 528.

---

[2] Although Carty also argues that her new *Brady* and *Giglio* claims meet AEDPA's requirement that no reasonable factfinder would have convicted Carty of capital murder when combined with her previously brought ineffective assistance of counsel claims, and that the accumulation of constitutional error separately violates due process, we pretermit these claims, as their predicate, the ability to bring her new *Brady* and *Giglio* claims sought through the motion for authorization at bar, has not been met.

12

Nor does the record before us reveal a basis for a finding of due diligence under AEDPA.  Caston and Anderson do not state in their affidavits that they were previously unavailable to Carty's counsel.  Although Mathis states in his affidavit that he has "attempted to avoid speaking to . . . Carty's attorneys because [he has] serious on-going health complications and because this case is a source of stress and difficulty for [him]," he does not state he would have refused to speak with them.  But more revealing is the fact that Mathis previously made himself available to defense counsel and provided an affidavit in 2006, indicating that Carty's counsel had access to Mathis before Carty's initial habeas petition.  Similarly, Robinson states that he "didn't want to talk about the case," but he never asserts he would not have discussed the case with Carty's lawyers had he been approached—Carty does not allege that her attorneys ever tried to speak with Robinson prior to her first habeas petition.  Given that Carty does not argue that Robinson or Mathis's statements of reticence to discuss the case amount to her and her counsel's diligence, and the absence of any evidence of an attempt to do so, we cannot conclude Carty has made a prima facie case of diligence with respect to these witnesses.

The final piece of evidence supporting Carty's claims of prosecutorial misconduct through threats and incentives is correspondence between prosecutors Spence and Goodhart regarding Comb.  It is true, as Carty argues, that she did not discover these emails until they were produced in discovery during her subsequent state habeas proceedings, after she filed her initial federal habeas petition.  But to conclude from this fact alone that she exercised diligence under AEDPA runs counter to our precedent.  *See In re Davila*, 888 F.3d at 186 ("Given the lack of argument as to why the discovery of the factual predicate for his new claim exhibited due diligence, [the petitioner] would have the court simply assume that due diligence corresponds directly with the date of discovery.  Such a standard plainly contradicts not only the plain language

of Section 2244(b)(2)(B) but also our precedent."). Absent from the record is any evidence explaining any prior diligent search for information relating to Comb.

**\*\*\***

Lacking any argument from Carty that she exercised diligence in attempting to uncover the evidence she now seeks to present in a second habeas petition, and unable to muster any such argument from the record before us, we conclude Carty has failed to make a prima facie showing of diligence under AEDPA and her motion for authorization fails.

Accordingly, we DENY Carty's motion for authorization to file a successive habeas petition.