**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| GUILLERMO SOLORIO, JR., *Petitioner*, | No. 15-71979 |
| v. | ORDER AND AMENDED OPINION |
| WILLIAM MUNIZ, Warden, *Respondent*. | |

Application to File Second or Successive Petition
Under 28 U.S.C. § 2254

Argued and Submitted October 19, 2017
San Francisco, California

Filed May 8, 2018
Amended July 20, 2018

Before: Consuelo M. Callahan and Carlos T. Bea, Circuit
Judges, and Jane A. Restani,\* Judge.

Order;
Opinion by Judge Callahan

---

\* The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel denied California state prisoner Guillermo Solorio Jr.'s application for permission to file a second or successive habeas corpus petition in federal district court to press a claim under *Brady v. Maryland* that the State of California suppressed materially exculpatory evidence that was unavailable to him when he first petitioned for habeas relief in federal court.

The panel held that Solorio failed to show that he exercised due diligence in failing to discover the allegedly suppressed evidence before he filed his first-in-time habeas petition, and that 28 U.S.C. § 2244(b)(2)(B)(i) therefore compels denial of his application to file a second or successive petition. The panel held that even if he had demonstrated due diligence, 28 U.S.C. § 2244(b)(2)(B)(ii) compels denial of the application because the new evidence fails to establish a prima facie showing of actual innocence.

### COUNSEL

Amitai Schwartz (argued), Law Offices of Amitai Schwartz, Emeryville, California, for Petitioner.

Pamela K. Critchfield (argued), Deputy Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General;

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Jeffrey M. Laurence, Senior Assistant Attorney General; Office of the Attorney General, San Francisco, California; for Respondent.

**ORDER**

The panel **AMENDS** its opinion in the above-captioned case filed May 8, 2018 as follows:

The sentence on page 17 of the slip opinion that states: <Weighing the considerable inculpatory evidence and the relatively gossamer allegedly exculpatory and impeachment evidence together, we find that Solorio fails to show by clear and convincing evidence that "no reasonable factfinder" would not have found him guilty had the new evidence been known at trial.> shall be replaced with the following sentence: <Weighing the considerable inculpatory evidence and the relatively gossamer allegedly exculpatory and impeachment evidence together, we find that Solorio fails to show by clear and convincing evidence that "no reasonable factfinder" would have found him guilty had the new evidence been known at trial.>

Judges Callahan and Bea vote to deny the petition for rehearing en banc. Judge Restani makes no recommendation on the petition. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petition for rehearing en banc is **DENIED**. No further petitions for panel rehearing or rehearing en banc will be accepted.

## OPINION

CALLAHAN, Circuit Judge:

Petitioner Guillermo Solorio, Jr. applies to this court for permission to file a second or successive habeas petition in federal district court to press a claim under *Brady v. Maryland*, 373 U.S. 83 (1963).  He argues that the State of California suppressed materially exculpatory evidence that was unavailable to him when he first petitioned for habeas relief in federal court.

Solorio's application leads us to address two issues. First, we must decide whether Solorio exercised due diligence in failing to discover the allegedly suppressed evidence before he filed his first-in-time habeas petition. Second, if we answer that question in the affirmative, we must decide whether he makes a prima facie showing of actual innocence.  As we answer both questions in the negative, we deny his application.

### I.

### A.

In 1999, a jury convicted Solorio (sometimes referred to by witnesses and investigators as "Capone") of first-degree murder for the March 5, 1998 killing of Vincent Morales ("Chente") with the special circumstance that Solorio killed Chente while lying in wait.  The jury also found true the allegations that Solorio was armed with a handgun during the murder, was a principal and that at least one principal used a handgun, and that he committed murder to benefit a street gang and carried a firearm during a street gang crime. Solorio received a sentence of life without parole consecutive with a ten-year determinate term.

The following evidence was presented at Solorio's trial, as recounted in the California Court of Appeal's 2001 decision. Solorio, a member of the Vario Greenfas Norte gang, was friends with Chente, a member of the Las Casitas gang. Chente was friends with a man named Guillermo Diaz (known as "Memo"), who was a gang member and worked at EZ Towing. Memo was acquainted with Solorio. Chente had warned Memo several times that someone wanted to kill Memo, apparently because Memo had stopped trafficking drugs. Memo relayed this information to several people, including the police.

Approximately three days before he was murdered, Chente drove a black Honda to EZ Towing with one or two others to see Memo. Chente asked Memo to give him the handgun kept by EZ Towing's owner and Memo did so. Chente paused and then threw the gun back to Memo and said, "I cannot do it." Memo testified that Chente then told him that Chente had been ordered to kill him. Chente also told Memo that Chente himself would be killed by "one of his friends" for failing to kill Memo.[1] Memo's colleague at EZ Towing, Gustavo Lopez, witnessed the verbal exchange. While Lopez did not hear what was said, he testified that Memo told him afterwards that Chente feared for his life because he had not killed Memo.

Chente, Solorio, and many of the prosecution's witnesses attended a barbeque on March 4—the day before Chente's murder. Attendees testified that Johnny Loredo and Solorio came to the barbeque in Solorio's black Honda. Chente, Loredo, and Solorio then left the barbeque but

---

[1] Expert testimony at trial established that Chente's killing was likely gang-related, and that it was common among local gangs to order a hit on a gang member who refused to kill someone.

returned with what Chente described as a fully loaded Uzi. Freddie Fonseca was also at the barbeque. He testified that he heard Chente say that Chente, Loredo, and Solorio were looking for guns. According to Fonseca, when the three returned, they all had guns, and Solorio in particular had a .38-caliber handgun. The three men then left together in the black Honda and did not return.

According to Mario Moya, he and Chente went to another party the next morning—the day of the murder. Loredo and Solorio arrived at that party and asked Chente to leave with them. Chente did so and the three departed in Solorio's black Honda at around 1:30 or 2:00 p.m. Chente was wearing the same clothes as the ones later recovered from his body, which was found in a ditch on the side of Highway 152 in Monterey County.

Rosalie Rivera testified that, on March 6—the day after the murder—she was in an area known as the "Orchards," visiting a man named Gerardo. She saw a green Honda pull up with Loredo and Solorio inside. The two men removed a gasoline can and garbage bag from the car trunk, and set the bag on fire in a makeshift pit. Rivera witnessed the men laughing and heard Loredo say: "that fucker's finally gone."

Gerardo apparently knew Loredo and Solorio. Rivera heard Solorio ask Gerardo if she was a snitch. Rivera later spoke to her friend, Hector Espinoza, who was a gang member. Espinoza told her that some people in a green Honda had shot Chente, and confirmed that Loredo and Solorio were responsible for Chente's death.

In an interview with police, Solorio contradicted much of the witness testimony against him. He denied having seen Chente at the barbeque or at the party the next day. He also denied knowing Memo, Fonseca, or Loredo.

**B.**

The California Court of Appeal affirmed Solorio's conviction in 2001 and the California Supreme Court denied review. In 2003, Solorio filed his first federal habeas petition in district court. In 2007, the federal district court denied the petition.

In 2010, Solorio filed a *pro se* motion for post-conviction discovery in state superior court. The state produced thousands of documents, some of which had not previously been turned over to the defense. As is pertinent here, certain documents revealed that Memo was a confidential police informant who received leniency on a traffic citation for assisting the prosecution in Solorio's case. The State also turned over a tape of an interview with Freddie Fonseca that Solorio argues is exculpatory and impeaching.

In 2011, Solorio filed an application with this court to file a second or successive petition for a writ of habeas corpus, which raised claims unrelated to the *Brady* claims in the instant petition. This court denied the application.

Later in 2011, Solorio filed a petition for a writ of habeas corpus in state superior court, alleging, among other things, that the State violated its *Brady* obligations by failing to disclose the information regarding Memo and Fonseca. Part of the previously undisclosed prosecution files were five Salinas Police Department reports related to Memo's work as a confidential police informant. The state court found that Solorio's trial attorney knew that Memo had worked as a confidential informant because that information was revealed during preliminary motions. But it also found that Solorio's attorney did not know other facts revealed in the reports—namely, that Memo may have received benefits in other cases, and that Memo had obtained dismissal of a

traffic citation in exchange for information he gave to law enforcement in Solorio's case.

The state court determined that the new information was not material under *Brady* for several reasons. First, Memo's testimony was subject to substantial impeachment at trial. The jury heard about Memo's felony convictions for auto theft, burglary, and spousal abuse, and also learned that Memo was probably a drug dealer and a habitual liar. Indeed, the jury knew that Memo had previously lied to the police and the grand jury in Solorio's case. Second, the court suggested that the undisclosed impeachment evidence was, at most, cumulative. And third, Memo's testimony was corroborated by other witnesses. The court therefore deemed it unlikely that knowledge of the traffic citation favor would have changed even one juror's mind if the jury was already inclined to credit the testimony of a thoroughly impeached witness.

As for the taped record of the Fonseca interview, the court found that the tape was largely duplicative of Fonseca's grand jury testimony, which was read to the jury at Solorio's trial. Solorio quarrels with this determination in his instant petition, alleging that three pieces of information are new. He argues that, at the time of trial, the defense did not know of (1) Fonseca's taped statement that Solorio "wouldn't have the balls enough to [kill Chente]," (2) Fonseca's equivocation over whether Solorio actually had a .38-caliber handgun when he returned to the barbeque,[2] and (3) a colloquy with police in which they refused to cut a deal with Fonseca in return for his

---

[2] Chente was killed with a .38.

cooperation.[3]  The court determined that the first two pieces of information were not material under *Brady* because the statements were either duplicative of what was disclosed before trial or not exculpatory.  As for Fonseca's attempt to gain favor with the police, the court found that it was not material impeachment evidence because no inducement was offered to Fonseca.[4]  In 2014, the court denied Solorio's petition.

## C.

Later in 2014, Solorio filed a petition for a writ of habeas corpus in the California Court of Appeal, which the court rejected in February 2015.  Solorio's subsequent petition for review with the California Supreme Court was summarily denied in April 2015.  Solorio then filed the instant application before this court, seeking permission to file a second or successive habeas petition in federal district court

---

[3] Solorio also notes Fonseca's taped statement that "everyone" was saying that Loredo killed Chente, but acknowledges that Solorio's trial counsel knew of this statement at trial because it was included in a detective's report that was turned over to the defense.

[4] Sergeant Earl Pennington told Fonseca that "all we can do is if you, when you give us information we can take that information and we could do the best we can to help you out, *but we can't promise you anything up front, that is illegal, we can't, we just can't do that.*"  Sergeant Steve Angus similarly told Fonseca that "we can't cut any deal, we can't," with Pennington later adding that "[w]e don't have the authority to make any promises or anything, we can't do that."  At the conclusion of the interview, Pennington told Fonseca that "[w]e don't know what they're going to do with you" but said that the officers would "tell them" that "you cooperated with us."

to raise his *Brady* claims based on the Memo and Fonseca evidence.[5]

## II.

Our review of an application to file a second or successive habeas petition is governed by the standard set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA").[6]  *See* 28 U.S.C. § 2244(b)(2)–(b)(3).  AEDPA § 2244(b)(2) provides that

> [a] claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
> > (A)    the applicant shows that the claim relies on a new rule of constitutional law, made

---

[5] Solorio's application to file a second or successive habeas petition makes no argument regarding his previously-advanced *Brady* claim that the prosecution also suppressed the tape of an interview with one Veronica Moya.  Because we generally deem abandoned arguments not refreshed on appeal, we decline to assess the probative value of the alleged Veronica Moya evidence.  *See Collins v. City of San Diego*, 841 F.2d 337, 339 (9th Cir. 1988) (issue abandoned where not raised on appeal).

[6] Solorio appears to be of two minds as to the nature of his application.  At one point he argues that his *Brady* claim "could not have been presented" at the time he filed his first-in-time habeas petition and so it should "not fall within the scope of 28 U.S.C. § 2244 for second or successive petitions."  Yet practically in the same breath he concedes that "this is an application for a second or successive habeas corpus petition."  Irrespective of this internal tension, Solorio's second statement is correct for the reasons set forth in our concurrently filed opinion in *Brown v. Muniz*, No. 16-15442, — F.3d — (9th Cir. 2018).

retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)

    (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

    (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). The question before us is whether Solorio satisfies the requirements under § 2244(b)(2)(B)(i)–(ii), which is a necessary prerequisite to filing a second or successive habeas petition. Specifically, we must decide whether Solorio exercised due diligence in failing to discover the allegedly exculpatory Memo reports and the Fonseca tape, and, if so, whether he has made a prima facie showing of actual innocence based on that evidence.

## A.

Solorio argues that the alleged *Brady* materials—the Memo reports and the Fonseca tape—were not discoverable before he filed his first federal habeas petition in 2003. First,

Solorio alleges that, while he knew at the time of his trial in 1999 that Memo was a confidential informant, he "did not know the extent of Memo's work for the police, the dates of his work, or most importantly the extent to which [Memo] traded information for favors or sought favors." Solorio argues that a discovery request under California Penal Code § 1054.9, which ultimately resulted in the release of the Memo reports, would have been rejected if it had been filed earlier because Solorio could not have shown a reasonable basis for believing that the materials actually existed.

Second, Solorio asserts that, while he knew at the time of trial that Fonseca's interview was audio- and video-taped, and he concedes that there was "a reasonable basis to believe [the tape] existed," he "reasonably would have assumed that they were not consequential because his attorney did not use them at trial."

We hold that Solorio fails to show that he exercised due diligence in obtaining the Memo reports and the Fonseca tape because he does not offer a plausible explanation for why he could not have made his § 1054.9 discovery request before he filed his first-in-time habeas petition. In *King v. Trujillo*, 638 F.3d 726, 732 (9th Cir. 2011) (per curiam), we held that the petitioner failed to exercise due diligence in discovering that a tape introduced at trial was a copy rather than the original. We credited the state court's finding that the recording "existed at trial and [King] had an opportunity to examine it at that time." *Id.* (internal quotation marks omitted). But King waited twenty years—until a Federal Public Defender was appointed to represent him—to examine the tape. *Id.* Because King "'would have learned of the new evidence [earlier] had he exercised reasonable care,'" we held that "[h]is failure to exercise that care preclude[d] relief." *Id.* (quoting *Souliotes v. Evans*, 622 F.3d

1173, 1178 (9th Cir. 2010)).  Similarly, in *Woratzeck v. Stewart*, 118 F.3d 648, 652 (9th Cir. 1997), we held that the petitioner failed to exercise due diligence in uncovering information showing that the State had destroyed evidence because he had "known about its (possible) destruction for several years."  Indeed, before he filed his initial habeas petition the petitioner knew of an evidence card stating explicitly that evidence was destroyed.  *Id.*

To be sure, the due diligence inquiry is a function of whether Solorio had some indication before filing his initial petition that the alleged exculpatory evidence existed.  If he had no reason to investigate Memo's cooperation or Fonseca's taped statements, then he could not have been dilatory in failing to investigate further.  On this question, the circumstances are somewhat more favorable to Solorio than they were in *Woratzeck* and *King*.  Whereas Woratzeck had at his disposal facts showing that evidence had, in fact, been destroyed, Solorio did not know what Fonseca said on the interview tape or the full extent of Memo's cooperation.  And whereas the question in *King* was whether the tape King knew existed was an original, here the issue is not the physical tape's provenance—a tape that Solorio knew existed—but its contents.

These distinguishing features do not, however, justify Solorio's delay in acting.  A petitioner must exercise due diligence in investigating new facts where he is on notice that new evidence *might* exist.  He cannot escape the due diligence requirement simply by showing he did not know of the new evidence earlier.  *Cf. Babbitt v. Woodford*, 177 F.3d 744, 747 (9th Cir. 1999) (black petitioner failed to exercise due diligence where his counsel's failure to question an all-white jury about *their* potential race bias put him on notice that his counsel *might*, *himself*, harbor racial

animus); *In re Young*, 789 F.3d 518, 528 (5th Cir. 2015) (interpreting an analogous phrase under AEDPA as meaning "the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim"). Indeed, a contrary interpretation would render the due diligence requirement superfluous, as the whole point of § 2244(b)(2)(B)(i) is to address facts that were *not* known previously. The due diligence inquiry therefore turns on two factors: (1) whether the petitioner was on inquiry notice to investigate further, and, if so, (2) whether the petitioner took reasonable steps to conduct such an investigation. *See Babbitt*, 177 F.3d at 747.

We conclude that Solorio was on inquiry notice to investigate the Fonseca tape and the scope of Memo's cooperation with the police before he filed his first-in-time habeas petition. First, Solorio concedes that he knew *at the time of trial* that Memo was a confidential police informant and that Fonseca's interview was taped. Solorio's knowledge of Memo's informant status and the existence of Fonseca's taped interviews was sufficient to put him on notice to investigate further. Indeed, additional inquiry could have led to the discovery that Memo received leniency on a traffic citation in exchange for his testimony against Solorio, and that Fonseca made at least one statement on the tape that was not revealed at trial. Yet Solorio did nothing to discover the Fonseca tape or the full extent of Memo's assistance to the police until years after he filed his initial petition.[7] Accordingly, Solorio fails to demonstrate due diligence in researching the alleged *Brady* material.

---

[7] Solorio argues that it would have been futile to file his § 1054.9 discovery request earlier because that provision does "not allow such a

**B.**

Solorio's failure to exercise due diligence compels denial of his application. But for the sake of completeness, we also address the second prong of § 2244(b)(2)(B), and assess whether Solorio makes a prima facie showing of actual innocence by clear and convincing evidence.

Solorio argues that the five reports on Memo, showing that Memo was a confidential police informant and that he received a benefit for his testimony in the form of a dismissed traffic citation, are materially impeaching. But, as the state court determined, Memo's testimony was subject to substantial impeachment at trial. The jury learned that Memo was probably a drug dealer and had previously lied to the police and a grand jury in Solorio's case. Solorio fails to show that information regarding dismissal of a traffic infraction undermines confidence in the jury's verdict. Instead, it is merely cumulative of the impeachment evidence presented at Solorio's trial. *See United States v. Endicott*, 869 F.2d 452, 456 (9th Cir. 1989) ("newly discovered evidence to impeach a government witness does not warrant a new trial when the evidence would not have affected the jury's assessment of the witness' credibility and when the witness was subjected to vigorous cross-examination"); *cf. Turner v. United States*, 137 S. Ct. 1885, 1894–95 (2017) (newly discovered evidence that witness had used illicit drugs was merely cumulative of other

---

broad fishing expedition." Solorio's argument is unpersuasive because he prevailed on his § 1054.9 request when he eventually filed it. This plainly rebuts his argument that it was infeasible for him to make the same request before he filed his initial habeas petition, and thus does nothing to advance his assertion that he exercised due diligence.

impeachment evidence disclosed to the jury at trial, including that the witness had frequently used drugs).

Solorio's reliance on Fonseca's taped statements is similarly unavailing. First, most of the taped statements duplicated Fonseca's testimony to the grand jury, which was read to the jury at Solorio's trial. The jury was therefore privy to most of Fonseca's statements from the interview. Second, Solorio's insistence that the tape reveals *for the first time* Fonseca's prevarication on whether he saw Solorio with a .38—the type of gun used to kill Chente—is belied by the record. Indeed, the police notes from the taped interview— which Solorio admits he had at the time of trial—reflect Fonseca's inconsistent answers on whether he saw Solorio with a .38, or any gun at all. For example, at one point Sergeant Steve Angus' notes state: "Capone[—i.e., Solorio] had a revolver." But they later state:

> Didn't c Capone's gun. Hrd people bhnd him talking about it. v talking about. v talking to Johnny & unk others. Then Johnny, v, and Capone walk by w. Johnny showed Uzi in waist, v. showed gun in hand. Capone show nothing. [??] came up w/ a nickel plated .38 for Capone. Thinks it was v said it.

Thus, Solorio's claim that Fonseca's equivocal answers are new evidence is plainly wrong: Solorio knew of Fonseca's equivocation at the time of trial. What *is* new from the tape are two pieces of information: Fonseca's statement that Solorio "wouldn't have the balls enough to do, he don't do shit like that"—i.e., kill Chente, and a colloquy with police in which they refused to cut a deal with Fonseca on a charge in a separate case in return for his cooperation.

The new information in the Memo reports and on the Fonseca tape, while having limited impeachment and exculpatory value, pales when set against the balance of inculpatory evidence presented at trial and the impeachment evidence against Memo. Solorio does not dispute (1) eyewitness testimony that Chente was last seen with Solorio on the day of the murder, (2) Rivera's testimony that she saw Solorio and Loredo burn a garbage bag while celebrating that "that fucker's finally gone," (3) Rivera's testimony that Solorio asked Gerardo whether Rivera was a snitch, (4) Espinoza's statement that Solorio and Loredo were responsible for killing Chente, (5) Solorio's thoroughly contradicted testimony that he did not know Memo, Fonseca, or Loredo, and did not see Chente at the barbeque or at the party the next day, (6) the testimony of multiple eyewitnesses that Chente and others drove to Memo's business in a black Honda—which matches the description of Solorio's vehicle—where Chente told Memo he would be killed for not killing Memo, and (7) the impeachment material against Memo that was introduced at trial—namely, that he was probably a drug dealer and had lied to the police and the grand jury in Solorio's case.[8]

---

[8] It is doubtful that any discussion between Fonseca and Sergeants Pennington and Angus regarding a deal has material impeachment value. First, Pennington and Angus steadfastly *refused* to cut a deal with Fonseca in return for his statement. Second, at least one of Fonseca's statements was exculpatory—namely, his allegedly suppressed statement that Solorio "wouldn't have the balls" to kill Chente—and thus inured to Solorio's *benefit*. Similarly, Fonseca's equivocation over whether Solorio had a .38 at the barbeque hardly indicates an inclination to warp the truth to bolster the prosecution's case. The upshot is that Solorio tries to have it both ways: arguing on the one hand that Fonseca's (suppressed) exculpatory statement would have helped him, while simultaneously insisting that he should have had the opportunity to discredit Fonseca's testimony. Such contradictory assertions impair

Weighing the considerable inculpatory evidence and the relatively gossamer allegedly exculpatory and impeachment evidence together, we find that Solorio fails to show by clear and convincing evidence that "no reasonable factfinder" would have found him guilty had the new evidence been known at trial. 28 U.S.C. § 2244(b)(2)(B)(ii); *see also King*, 638 F.3d at 730–32 (affidavit of prosecution witness that he was too intoxicated to recall witnessing the murder, which he had testified to witnessing at trial, was insufficient to show that "no reasonable factfinder" would have found him guilty); *Thompson v. Calderon*, 151 F.3d 918, 924–26 (9th Cir. 1998) (en banc) (statement that petitioner and victim were having consensual sex where victim was murdered did not suffice to make out a prima facie showing of actual innocence when viewed together with the inculpatory evidence presented at trial). We therefore reject Solorio's application to file a second or successive habeas petition.

## CONCLUSION

Because Solorio fails to demonstrate due diligence with respect to his *Brady* claim, and because, even if he cleared that hurdle, the new evidence fails to establish a prima facie showing of actual innocence, we **DENY** Solorio's application to file a second or successive habeas petition.

---

Solorio's claim of a *material*—i.e., prejudicial—*Brady* violation. We therefore conclude that Solorio was not prejudiced by his trial counsel's inability to impeach Fonseca's testimony with the newly discovered evidence. *Cf. Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (witness' attempt to secure a deal may be material "because the jury 'might well have concluded that [the witness] had fabricated testimony *in order to curry the [prosecution's] favor*'" (quoting *Napue v. Illinois*, 360 U.S. 264, 270 (1959) (emphasis added)).